## J. M. Thompson v. The State.

### *No. 954. Decided March 4th, 1896.*

| 35 | 511 |
|----|-----|
| 137 | 292 |

**1. Severance of Joint Defendants.**

The right of defendants to a severance at the trial will not be granted when the severance will operate as a continuance of the case. Code Crim. Proc., Art. 669a.

**2. Robbery—Indictment—Duplicity.**

Where an indictment for robbery charges in one count the taking of $1282.22; and, also further charges the taking of $100 other dollars from the same assaulted party. Held: The transactions were not incongruous, and the indictment is not duplicituous.

**3. Same—Asportation.**

An indictment for robbery which alleged that defendant "fraudulently took from the possession of said A.," etc., is sufficient without a further allegation that the property was carried away. As in theft, so in robbery, an allegation of asportation is unnecessary in the indictment, the same language substantially being used to define both offenses.

**4. Same—Description of Money—Meaning of the Term Money.**

In an indictment for robbery, where the money taken was described as, "Twelve hundred and eighty-two dollars and twenty-two cents, in money of the value of twelve hundred and eighty-two dollars and twenty-two cents, and one hundred dollars in money of the value of one hundred dollars." Held: The description of the money was sufficient. The term "money" means that which is by the acts of Congress of the United States made a legal tender, whether coin or currency. Following, Menear v. State, 30 Tex. Crim. App., 475.

**5. Evidence—Testimony Too Remote.**

On a trial for robbery, where defendant offered to prove that a few days before the robbery, a witness saw two men in the vicinity, one tall, and the other a short man with a roll of money, and that he said to them, "You must have been robbing a train;" to which they replied, "Never mind, they had the money:" no connection shown between these men and the robbery. Held: The evidence was too remote, and was properly excluded by the court, and especially so in view of the positive evidence which identified the robbers.

**6. Conspiracy—Evidence—Acts and Declarations of Co-conspirators.**

Where a conspiracy to commit crime has been established, what either of the parties said or did in pursuance thereof and prior to its consummation, is admissible as evidence against either of the others.

**7. Identification of Defendants—Witness' Explanation of His Conduct With Reference Thereto.**

When a witness testifies that he identified the defendants at the time they committed the offense, it is permissible for him to testify, that afterwards he failed to point them out and identify them when he had an opportunity, because he was afraid of his personal safety should he then accuse the defendants of the crime.

**8. Evidence—Unsigned Letter.**

A letter purporting to be written by defendant, but which is not signed, is admissible in evidence when it is proven to be in the handwriting of defendant, and the contents and circumstances strongly corroborate that evidence.

**9. Indictment—Money—Fruits of the Crime—Identification of.**

On a trial for robbery, it is competent and admissible to bring before the jury, as fruits of the robbery, a lot of money, which was shown to have been buried on the premises of one of the defendants; and where it had been located by the testimony of an accomplice, and identified by him.

**10. Evidence—Statement of a Codefendant to a Third Party.**

Evidence of the statements made in conversation by a codefendant to a witness, in the presence of defendant, about his connection with the crime, is inadmissible on cross-examination of the witness where the State had not introduced in evidence anything as to a conversation between these parties.

**11. Evidence to Discredit a Witness.**

It is competent for the State, as going to the discredit of a female witness, who has testified for the defendant, to prove, on her cross-examination, that she was the kept woman of a codefendant.

**12. Impeachment of a Defendant Witness, by Statements Made While in Jail—Charge.**

It is competent to impeach a defendant, who has testified in his own behalf as a witness, by proof of contradictory statements made by him while he was in jail. But, in such case, it is the duty of the court, as was done, to limit and restrict the effect and purpose of such evidence.

**13. Introduction of Evidence by the State after Defendant has Closed—Practice.**

It is within the discretion of the trial court, after the defendant has closed his testimony, to permit the State to introduce evidence not strictly in rebuttal. And the action of the court in this regard will not be reviewed, where it is not shown that the discretion has been abused.

APPEAL from the Criminal District Court of Harris. Tried below before Hon. E. D. CAVIN.

Appellant and one J. M. Crain were indicted in the District Court of Fort Bend County, for the robbery of C. M. Adams, in said county, on the 23rd day of January, 1895.

The indictment is as follows:

"In the name and by the authority of the State of Texas. The grand jurors for the County of Fort Bend, State aforesaid, duly organized as such at the March term, A. D. 1895, of the District Court for said county, upon their oaths in said court present, that J. M. Thompson and J. M. Crain, on or about the 23rd day of January, one thousand eight hundred and ninety-five (1895) and anterior to the presentment of this indictment in the County of Fort Bend, and State of Texas, did then and there unlawfully in and upon C. M. Adams, did make an assault, and did then and there by said assault and by violence to the said C. M. Adams, and by putting the said C. M. Adams in fear of life and bodily injury, fraudulently and without the consent of the said C. M. Adams, take from the person and possession of him, the said C. M. Adams, twelve hundred and eighty-two dollars and twenty-two cents ($1282.22) in money of the value of twelve hundred and eighty-two dollars and twenty-two cents, the same being the corporeal personal property of the said C. M. Adams, with the intent to deprive the said C. M. Adams, the owner of said corporeal personal property, of the value of the same, and to appropriate the same to the use and benefit of them (the said J.

M. Thompson and J. M. Crain), and the said J. M. Thompson and J. M. Crain, on or about the 23rd day of January, 1895, did then and there, in the county and State aforesaid, in and upon C. M. Adams, make an assault, and did then and there, by said assault and by violence to the said C. M. Adams, and by putting the said C. M. Adams in fear of life and bodily injury, fraudulently and without the consent of the said C. M. Adams, take from the person and possession of the said C. M. Adams, one hundred dollars in money, of the value of one hundred dollars, the same being the corporeal personal property of him (the said C. M. Adams) and with the intent to deprive the said C. M. Adams of the value thereof, and appropriate the same to the use and benefit of them (the said J. M. Thompson and J. M. Crain) contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."

The venue was changed from the District Court of Fort Bend, to the District Court of Harris County. In the District Court of Harris County a severance for trial was granted defendants, upon their motion, with an agreement that J. M. Crain should be tried first, but when the case of Crain was called for trial, he was so seriously ill in jail that he could not be brought into court, and the case, as to him, was continued on the 14th of October, 1895. On the 14th of December, 1895, appellant, Thompson, was alone placed upon trial, and the trial resulted in his conviction, with the punishment assessed at sixteen years' imprisonment in the penitentiary.

C. M. Adams, testified: "On the morning of the 23rd of January, 1895, I received from the Wells Fargo Express Company, through witness, Haley, the messenger, three sacks of money, shipped from the T. W. House bank, to be delivered by me to three different parties at Sugarland; the sacks and seals and tags were intact. I am the station and express agent there. When I received the money I placed it in the safe, which I locked, and then sat down at my desk and began checking off my accounts. This money, as also one hundred dollars in United States silver dollars, of the value of one dollar each, had been delivered to me on that morning, to be shipped to Mr. Japhet, at Houston. I was in the exclusive possession and control at the time of the robbery. Mr. Paul Dolfino came in and also began checking off some accounts for Cunningham & Miller; while we were writing two men came in and ordered us to 'hands up,' and open the safe. Thinking it was some of the boys around the station playing pranks, I paid no attention to it, when one of them struck me on the head with a pistol and ordered me to open the safe. I looked around then, and found that there were two masked men in the office with drawn pistols; one having me covered and the other having Mr. Dolfino covered with their pistols. I was unarmed, and seeing that resistance was useless, I went to the safe and began trying to unlock it; the safe was old and the combination did not work well, and I could not open it for some time, when the large man struck me again over the head with the pistol, when Mr. Dolfino told them that it

35th Crim. Rep.—33.

was cruel and inhuman to beat me up that way; that the safe was old and did not work well; that I was doing the best I could, and he replied, 'all right, take all the time you want, but hurry up.' I finally opened the safe and they took out the three sacks of money I had received that morning from the Wells Fargo express messenger, said to contain $1282.82. They took the sacks sealed with the tags on them, just as I received them; they also took a sack containing one hundred dollars that had been received that morning from J. M. Crain, to be sent by express to Houston to Mr. Japhet. When they took the money, they made me go out ahead of them at the back door and on across the railroad, where their horses were tied. One was a gray horse which I recognized as Mr. G. B. Miller's horse; the other was a bay or sorrel, I don't remember which. The small man mounted the Miller horse. While getting on their horses, the alarm was raised; the firing began and I ran off. The gray horse was hit in the fore shoulder by one of the shots. When we came out, at the back door, the two men left Mr. Dolfino near the back door. One of the men was a very large man, about six feet four inches high; and the other was a very small man, about five feet high. I should judge that the large man would weigh about 185 pounds, and the small man about 135. I saw nothing peculiar about the small man; did not notice that he had a crippled arm; in fact I paid but little attention to the small man, as my attention was called to the big man, who had me covered with his pistol. I noticed one peculiarity about the big man, that was the way he stood; he would not stand long on one foot, but kept shifting his weight from one foot to the other. I did not recognize either of the men and do not believe I would recognize them. I do not know who the men were. They were dressed in dark or blue overalls, had on blouses, and their masks consisted of some kind of white knit work, with eye-holes and breathing-holes, thrown over their heads and coming down over their face and shoulders. Ed Whatley, on or about the 20th of January, inquired of me when the money would come to pay off the guards (objected to, and exceptions taken). Ed Whatley is dead; was killed on the 4th of April. This all occurred in Fort Bend County, Texas. The robbery occurred on January 23rd, 1895, in Fort Bend County, Texas. I had counted the $100 that I had received that morning to be forwarded to Japhet. The one hundred dollars was in silver dollars of the current coin of the United States, each of the silver dollars was of the value of $1; the money was taken against my consent, and I opened the safe and let the robbers take the money because they were assaulting me by striking me over the head with a pistol, and because I was afraid they would kill me if I did not open the safe. The blood was running down my head and face from the blows I had received."

Paul Dolfino, testified: "In January, 1895, I was a deputy sheriff of Fort Bend County, in connection with my position with Cunningham & Miller. I, on that day, was at Sugarland station, in Fort Bend County. After the arrival of the N. Y. & T. train, I started from the

store to the station office to check up some accounts for Cunningham
& Miller; on the way I met Crain, told him I heard there were robbers
about; he went on to the store and I went into the depot office, where
Mr. Adams and myself began checking up the accounts, when two men
came in and said, 'Hands up,' and 'Open that safe.' I paid no attention
to it at the first summons, supposing that it was some of the boys playing
pranks; but the demand was repeated with an oath, and Adams and I
were covered each with a pistol; one of them struck Mr. Adams, and
then I looked around and found that two men were covering us with
their pistols." (Here the witness described the men as being masked, and
wearing checked overalls or slickers; one was a small man and the
other a large man; their dress, and the occurrence just as Adams did).
Continuing he said: "I recognized both men instantly, by their size,
their form, their motions and their voices; the big man was Ed Whatley,
the small man was the defendant, J. M. Thompson. I also recognized
him, the defendant Thompson, by his crippled arm. When he took up
a sack of the money he changed his pistol to the crippled right hand and
had to hold it to his side. His right arm has been broken and he has
but little use of it. Several times during the robbery, the small man,
who was the defendant at bar, said to me, 'God damn you, don't look at
me, turn your face the other way.' I had known the defendant and Ed
Whatley for many years. When they got the money they made Mr.
Adams march out the back door ahead of them; they crossed the rail-
road track, which ran by the door, and then they, defendant and What-
ley ran to where their horses were tied; the defendant and I walked side
by side out of the back door, where I stopped. Both Ed Whatley and
the defendant knew me, and knew that I was a deputy sheriff and went
armed. When they got to their horses, and while they were preparing
to mount, I shot at them, and Thompson shot back at me. Defendant
mounted a gray horse which I recognized as Miller's horse. I shot and
hit this gray horse in the fore shoulder. The alarm being given, the
firing became general; they mounted their horses and left at full speed.
I immediately organized a posse of four men and pursued them. I fol-
lowed the trail to where they went out of the field, and then took the trail
and kept it to the river; in the bottom, down the river about one-half
mile from the honkatonk, we found one of the horses ridden by the
robbers (the gray belonging to Col. Miller), which we took along with
us. The horse was shot in the fore shoulder and was bloody; here we lost
the trail, and we continued hunting the robbers in the bottom. We met
Mr. Ed Whatley in the bottom, told him what had occurred; he had a
blowing horn; he said, if we would go by his house with him, so as he
could get his pistol, he would go with us to hunt the robbers. We did
so, and he went with us to Crain's saloon, and we reached there about 11
o'clock; there we found the posse of four men under Col. Miller; the
defendant was there playing cards with Burton. We did not arrest, or
try to arrest either of them. Thompson was arrested that night by
another posse. I did not arrest them because I was afraid to do so.

Ed Whatley and Thompson were both dangerous men. I was an officer under oath and bond, and knew that it was my duty to arrest them. I heard that somebody, with faces blackened, was around Sugarland station in the night looking for me. (Objected to and exceptions taken). Yes, Tapscott was arrested and I took him before Mr. Adams and put a mask on him to show Adams that he was not the man. Yes, Thompson, Crain, Tapscott, Benton and Florence were arrested that night. Whatley was never arrested. I never told any one that I knew the men who committed the deed and that Whatley and Thompson did it, but the grand jury and Col. Cunningham. I don't remember that I made an affidavit, the day after the robbery, against Thompson, Crain, Benton, Tapscott and Florence, charging them with the offense. I know they were put in jail the day after the robbery, and I know that all, but Thompson and Crain, were promptly released. I had four men with me when we met Ed Whatley in the bottom. All were armed at Crain's saloon when Whatley and Thompson were both there; there were eight men in the posses all armed, we arrested neither of them. Thompson rode off on an errand for Crain, while we were there. Yes, there was a robbery at Sugarland once before, since I have been there. I was on guard at the station when it was done; the perpetrators were never found out. Yes, I testified before the grand jury just as I have today. I told my employer, Col. Cunningham, at once who the robbers were,. and that I knew them to be the defendant Thompson and Ed Whatley. I also told the next grand jury, which met in Fort Bend County, who the robbers were. Ed Whatley was killed the first day that the grand jury met, or the day before. I feared to tell that I knew that the robbers were Thompson and Whatley, because I feared being killed by them. I never was put on oath about what I knew about it, until I was called before the grand jury, and then I told the grand jury what I knew. Thompson and Whatley were both dangerous men, and I feared for my life had I openly accused them."

W. P. Jones, testified: "That he, as Justice of the Peace,. held the inquest on the dead body of Ed Whatley, and took a letter off the body" (which is handed him and which he identifies).

Jack Carroll, testified: "That he was acquainted with defendant Thompson's handwriting, and that the letter taken by the witness, Jones, from Whatley's dead body (which is shown him) was in defendant's handwriting. The letter was as follows:

'Richmond, Texas, March 23, 1895.
'Mr. Ed Whatley,

'Dear Friend: I have decided not to pay our lawyers over Twenty five Dollars more a Piece if we Pay any and if The Grand Jourours find a Bill against me want To get out of this Place So we have But one Show & That is in you we want some instruments To cut out with you will have To go ov To Galveston for Them we want 4 Diamond Bryer saws & Two wyre saws get English stub saw get one Bow made To fit Diamond

B They are made in This shape ⌒ you can get Them in very easy any night By getting a long cane Pole and Putting Them Through The East window, Though you will have to get up on The wall I send an old letter so you can see what we want also get a small bottle of acaforties get that money changed to currency if you can & send me Twenty Five Dollars in a sealed envelope & fix The other so we can get it in case we have to leave I have not got a cent & we are fairing pretty Bad Please do some Thing and oblige your True Friend

'P. S. Please Bring or Send my Trunk you can have it at Jimmie Jones.' "

J. B. Parker, testified: "I am and have been for years deputy sheriff for Harris County. I am a half-brother of Ed Whatley, and had heard rumors coupling Ed Whatley's name with the Sugarland robbery. . On the morning after Ed was killed at Walker's Station, I went to Walker's Station; there I met my half-brother, Walton Whatley, a boy 16 or 17 years of age, by the dead body of Ed Whatley, and I said to him, 'Now, Walton, I want you to tell me all about this robbery; you see what these things are leading to.' I had previously and during Ed's life, asked him about it, and he had denied knowing anything about it. This time he said also he knew nothing. We then took the body down to Sandy Point, and either just before or just after we buried him, I spoke to him (Walton) and he told me all about it; he told me where the money was buried. We came back to Houston, and then Witse Whatley, Walton Whatley and myself went out to Ed Whatley's place after the money. We went to the calf lot and dug down in the ground and took up a bucket or can of silver. It wasn't buried deep. We then found, under one of the houses, a can with seventy-five dollars in paper money. I then got in the wagon and was starting back when Walton said: 'Wait, I will get Crain's money.' He then went to a hollow tree and from it he got a tin can with one hundred and fifty dollars in it. This, he said, was Crain's money that he had turned over to his brother, Ed Whatley, to take care of for him the morning he was arrested the second time." (The express company here brought into court a lot of money, paper and silver, which Mr. Parker counted.) "That is the amount of money I found on Ed Whatley's place, to-wit: $232.50 in silver; one hundred and fifty in one package of paper money and $75 in paper money in another package. This is the amount I found, and I presume it is the same money I turned over to District Attorney Pinkney. I turned it over after getting the advice of my lawyer. I don't know whose money it is. When Walton told me the money was there, I went hurriedly there to get it, because I feared that, as he was only a boy, he might get it and do something imprudent with it. I talked with Ed about the robbery because some whom I knew were friends of his, had told me he was in the robbery. Charley Parnell was one who told me. I have been

informed that Parnell was employed by the express company to hunt up the robbers. I have known both Ed Whatley and the defendant all their lives. Their reputation for honesty and integrity was good. While they were both brave men and would fight upon provocation, yet I do not think their reputation was such as would warrant the belief, that either one would take undue advantage of an enemy. When Walton Whatley told me about what he knew of the affair, I at once called my step-father (Mr. Whatley) and my half-brothers (the brothers of Walton Whatley) and he, Walton Whatley, again recounted, in our presence, what he knew of brother Ed's connection with the robbery. I then went with him and found the money, which tallies with what is here now in court, at the place where Walton said it was. My step-father and half-brothers and I concluded at once to turn it over, and after I consulted with my attorney, Mr. Oliver, I turned the money over to Mr. Taft, the superintendent of the Wells Fargo Express, and he sent it to Mr. Pinkney, the District Attorney, at Richmond, Fort Bend County. I was not employed by the express company, and my only motive was to protect my younger brother, Walton, and the memory of my dead brother, Ed. I made no threat and offered no inducement to Walton Whatley, to get the statement he made; all I ever said to him in connection with it was, to tell the truth."

Walton Whatley testified: "That he was living with his brother, Ed Whatley, in January last. The night before the robbery his brother, Ed Whatley, told him to take two of his horses, early the next morning, to a certain place in the bottom about one-half a mile from the honka-tonk, near where Cunningham's fence runs to the river and to wait with the horses until they should come there. I took the horses there about 5 or 6 o'clock, a. m., as directed. After 9 o'clock my brother, Ed Whatley, and the defendant, came riding as fast as they could, to where I was waiting with the horses. The horses they were riding were jaded and covered with sweat. My brother was riding a bay horse, and the defendant riding a gray. I recognized the gray horse as Mr. Miller's horse. They had on checked overalls or slickers over their clothing and wore masks. When they got where I was, they got off the horses they were riding, turned them loose and run them off with brush switches; then they fired a brush pile and burnt the blouses and overalls they were wearing. They also had on masks, which they burned; they took one of the stirrups off of Thompson's saddle and threw it into the river because it had blood on it. The horse Thompson was riding was shot in the left fore shoulder, and the blood got on the stirrup. Thompson also got blood on one of his boots, and they threw them into the river. Then they got on my brother's horses and rode off. Thompson slept at Ed Whatley's house the night before the robbery, and he and my brother Ed left home the morning of the robbery, at about 3 or 4 o'clock in the morning. After Thompson and Crain were released from jail, they came to my brother's and went into the crib, and I saw them divide a large sum of money. They asked me to watch for them

and see that nobody came. When they got through, Crain took his share of the money in paper; and my brother and Thompson put the balance in a can and buried it in the lot. I heard the defendant say, two or three times, that it was the express money. I did not tell this as long as my brother lived; and, had he not been killed, I would not have told it. They did not give me the money. I never told anyone that I was getting two hundred and fifty a piece to convict Crain and Thompson. I don't remember whether I ever denied knowing anything about it to my father or half-brother. I didn't tell Julia Eldridge at Ry. Jackson's restaurant, in Richmond, in Ry. Jackson's presence, at the court when the venue in this case was changed, that I was going to swear just what I had been told to swear, and I was not crying. When my brother Ed and defendant Thompson came up to where I had the horses they had several sacks of money, which they hid under a brush pile. The masks they wore, when they rode up, were made out of cloth with places cut out for the eyes, and were over their faces. As soon as they had thrown their overalls and masks on the fire and thrown the stirrup and boot into the river, they mounted the horses which I had been holding and separated. Thompson was living at Crain's honkatonk at the time, and my brother Ed went there frequently. The next morning after the robbery, my brother got the sacks out of the brush pile and buried the money in the corn-crib. I afterwards saw Crain and the defendant and my brother divide the money. Crain took his share off with him, but my brother and defendant Thompson left theirs together, and buried same. My brothers, J. B. Parker and Witse Whatley, told me to tell the truth about everything, and it was this that I said to Julia Eldridge at Ry. Jackson's restaurant at Richmond when the venue of this case was changed. I told her I was going to tell the truth about everything."

The foregoing is the main testimony adduced for the State. The defense was an alibi, and the good character of both this appellant and Ed Whatley, which was proved by a number of witnesses. The other matters pertaining to defendant's bills of exceptions are sufficiently stated in the opinion.

*J. B. Brockman, Wm. Sorley, John C. Mitchell* and *W. L. Davidson,* for appellant.—The indictment in the first count charges J. M. Thompson and J. M. Crain, on or about January 23rd, 1895, with making an assault upon C. M. Adams, and by said assault and by violence and by putting the said C. M. Adams in fear of life and bodily injury, fraudulently and without the consent of the said C. M. Adams, take from the person and possession of him, the said C. M. Adams, $1282.22 in money of the value of $1282.22, etc., etc., and in the second count said indictment charges J. M. Thompson and J. M. Crain, on or about January 23rd, 1895, with making an assault in and upon C. M. Adams, and by said assault and by violence and by putting the said C. M. Adams in fear of life and bodily injury, fraudulently and

without the consent of the said C. M. Adams, with taking from the person and possession of the said C. M. Adams, one hundred dollars in money of the value of $100, etc., etc. Thus charging the taking of $1282.22, in one count and charging the taking of the $100, in the other count, on the same day and from the same person, charging two separate and distinct assaults and two separate and distinct takings from the same person and on the same day, constituting two separate and distinct offenses in the same indictment; subjecting the defendant to the necessity of meeting different evidence and of introducing different evidence in defense of each charge, both as to his participation therein and the identification of the money, and subjecting him to a higher degree of punishment at the hands of the jury, and the State should have elected upon the trial, and before the close of the case upon which charge of the indictment the State was claiming a conviction, and the State having failed so to elect, we most earnestly maintain that the defendant has suffered serious injury and that upon this ground the case should be reversed. Henderson v. State, 2 Tex. Crim. App., 89; Fisher v. State, 33 Texas, 792; State v. Dorset, 21 Texas, 657; (last clause) State v. Edmondson, 43 Texas, 165; Whart. Amer. Crim. Law, Sec. 381.

In addition we quote: "Since the prosecuting officer has drawn the indictment and planned the evidence after his own pleasure, with no opportunity for the defendant to object, the judge at the trial will so restrict this officer in respect to both the allegations and proofs, as, by compelling him, to choose between two or more otherwise permissible lines of attack, to avoid confusion and injustice to the defense." Bishop's New Crim. Proc., Vol. 1, Sec. 454.

Our second proposition is, that the indictment fails to allege in either count the "carrying away" either the $1282.22, or any part thereof, or the $100, or any part thereof, which is a fatal defect in said indictment, as the "carrying away" is a necessary element to constitute the offense of robbery charged, in contradistinction to theft from the person, and not being alleged could not be proved and hence we claim for this reason that the indictment will not sustain a conviction. Whart. Amer. Crim. Law, Sec. 1697.

It is a well recognized rule, that where an indictment for robbery follows the form at common law it is sufficient, and when it does not contain the requisite allegation of the elements at common law it is bad, unless such necessary allegations are specially dispensed with under the statute, which necessary element to constitute the offense of robbery has not been eliminated by our amended statute, Penal Code, Art. 856, as has been done in the case of theft, Penal Code, Art. 860. Cain v. State, 18 Texas, 387; Burns v. State, 12 Tex. Crim. App., 269.

Our third proposition is, that the indictment is also fatally and fundamently defective in this, that, it first charges J. M. Thompson and J. M. Crain with assaulting C. M. Adams, and by said assault and by violence and by putting the said C. M. Adams in fear of life and bodily injury, fraudulently and without the consent of the said C. M. Adams,

with taking from the person and possession of the said C. M. Adams, "twelve hundred and eighty-two dollars and twenty-two cents in money, of the value of twelve hundred and eighty-two dollars and twenty-two cents," etc., etc., and then charges J. M. Thompson and J. M. Crain with assaulting C. M. Adams, and by said assault and by violence, and by putting the said C. M. Adams in fear of life and bodily injury, fraudulently and without the consent of the said C. M. Adams, with taking from the person and possession of the said C. M. Adams, "one hundred dollars in money, of the value of one hundred dollars," etc., etc., and fails absolutely, in either count of said indictment, or in any part of said indictment, to describe the money alleged to have been taken, to be the coin or currency of the United States, or of any other country, or State, and is, therefore, fundamentally and fatally defective in the description of the property charged to have been stolen, and will not sustain a conviction; and, therefore, the case should be reversed and dismissed.

In Lavarre v. State, 1 Tex. Crim. App., 685, where the defendant was charged with having entered a dwelling house and unlawfully and fraudulently stealing, taking and carrying away, three hundred gold dollars, the court held the indictment to be insufficient for not alleging the "gold dollars to be of the lawful money or current coin of the United States, or any other country," citing, Ridgeway v. State, 41 Texas, 232; 1 Whart. Amer. Crim. Law, Sec. 363; Martinez v. State, 41 Texas, 164.

This court in Lavarre v. State, referring to Boyle v. State, 37 Texas, 360, says: "In Boyle v. State, an indictment was held invalid which charged the defendant with stealing 'the sum of sixty-five dollars of the following description: Two twenty-dollar gold pieces and one five-dollar gold piece, and two ten-dollar United States currency bills, and one money purse.' The court says: 'We think the indictment bad for uncertainty, both as to description and value of the articles charged to have been stolen. The coin is alleged to be of certain denominations, but it fails to state that they are of the current coin of the United States, or any other country, and the universally established rules for criminal pleadings will not authorize the indulgence in presumptions and inferences to aid an indictment in so material a part of its charge.'" Citing, 2 Bishop's Crim. Proc., 698 et seq.

And the court in closing says: "In the light of all the leading authorities, the indictment in this case is fatally defective; therefore the judgment of the court is reversed and the case dismissed."

In Winston v. State, 9 Tex. Crim. App., 143, it was held that the indictment was insufficient which described the property obtained by means of the robbery, as "one currency note of the denomination of ten dollars, a further and more particular description of which is to the grand jury unknown." And the court says: "We are of the opinion that this description of the property is insufficient. It does not aver of what nation, country or State, the note was currency. This could and should have been done as descriptive of the kind of property."

And the court further on says: "Robbery is simply aggravated larceny, and the same particularity is required in some of the States, and should be observed, it seems to us, in describing the kind of property, as is required in indictments for theft." Citing, Brannon's case, 25 Ind., 403; Croker's case, 47 Ala., 53; Clarke's Crim. Law, Sec. 760. Also citing, Lavarre v. State, supra.

We do not deem it necessary to do more than call attention to the pertinency of the propositions stated, and the authorities quoted and cited, and we therefore submit our case without attempt at further elucidation or remark, believing this honorable court will grant our motion and reverse and dismiss the judgment and case against appellant.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellant in this case was convicted of robbery, and his punishment assessed at sixteen years in the penitentiary, and he prosecutes this appeal. Appellant claimed a severance in this case, and asked that Crain, his codefendant, be placed first upon trial. It was shown that Crain was too sick at the time to be tried, and appellant then asked to continue the case. This was refused. It is evident that the effect of the severance would have been to continue the case as to both defendants. This, we understand, is not authorized by the statutes granting defendants a right to sever. Furthermore, the record shows that Crain died, and appellant could never have the benefit of his testimony. The indictment in this case is in one count. It charges that $1282.22 was taken by means of the robbery from C. M. Adams, and further charges that the defendant took one hundred other dollars from said C. M. Adams. The transactions were not incongruous, and there is no duplicity in the indictment. Appellant also questions the validity of the indictment on the ground that there is no allegation that the appellant carried away the property, insisting that the allegation merely that he "fraudulently took from the possession of the said Adams" is not sufficient. Substantially the same language is used in our statute defining robbery as is used in the statute defining theft, on the question of the taking, and it has been held in cases of theft that it need not be alleged that the property was carried away. See, Willson's Crim. Stat., § 1260; Walker v. State, 3 Tex. Crim. App., 70; Connor v. State, 6 Tex. Crim. App., 455. The indictment in this respect was sufficient. It is also objected that the indictment is defective in that it does not sufficiently describe the property alleged to have been taken. The language used in the indictment is as follows: "Twelve hundred and eighty-two dollars and twenty-two cents in money, of the value of twelve hundred and eighty-two dollars and twenty-two cents; and one hundred dollars in money, of the value of one hundred dollars." The term "money," with reference to theft and embezzlement, has been defined by our statutes. See Code Crim. Proc., Art. 428i, and Block v. State, 44 Texas, 620. The term "money" has also been construed, under the statute making the misapplication of public money an offense; and it is held that.

money means "the legal tender, metallic coins or legal tender currency of the United States." See Lewis v. State, 28 Tex. Crim. App., 140. We hold that, as to robbery, the term "money" means the same thing. It means that which is by the acts of the Congress of the United States made a legal tender, whether coin or currency; and the allegations of the indictment in this regard were sufficient. See Menear v. State; 30 Tex. Crim. App., 475.

Appellant offered to prove that, a few days before the robbery the witness, Sam Kindred, saw two men in that vicinity, one a tall and the other a short man; that they had a roll of money, and he said to them, "You must have been robbing a train." They replied, "Never mind; they had the money." Witness had never seen either of said parties since. An objection to this testimony by the State was sustained by the court. While the object of the evidence is not stated by appellant, we presume his purpose was to show some connection between these two men and the robbery; but the bill shows no such connection, and nothing further is shown in the record with reference to these two men. This isolated testimony, even in a case of purely circumstantial evidence, would be too remote; the rule being, in cases of circumstantial evidence, that it is relevant to prove motive on the part of some other person than the accused to commit the offense. But motive alone is not sufficient to authorize the evidence; there must be further testimony tending to connect such person with the offense. See Kunde v. State, 22 Tex. Crim. App., 65; Henry v. State (Austin term, 1895) 30 S. W. Rep., 802. Not only is there a want of testimony tending to show any connection between said two strangers and said robbery, but this case is one in which there was positive evidence identifying these robbers. This also disposes of appellant's bill of exception No. 20. The court permitted testimony, over appellant's objection, that Ed Whatley, on the 20th of December, three days preceding the robbery, inquired of the witness, C. M. Adams, the express agent, when the money to pay the guards would arrive. This testimony, we think, was admissible. The record abundantly shows a conspiracy and acting together on the part of these three men, Whatley, Crain, and Thompson, to perpetrate the robbery, and what either did or said in pursuance thereof, and prior to its consummation, was admissible against either of the others. In our opinion, after it had been shown that the Deputy Sheriff, Dolfino, saw and identified the men at the time they committed the robbery; that thereafter he failed to point them out or identify them when he had an opportunity to do so; that his reason for such conduct was because he was afraid of his personal safety should he accuse the defendants of the crime—this was legitimate testimony to explain his conduct. The State introduced a letter purporting to be written by the defendant to Ed Whatley, which was not signed, but it was shown by testimony that it was in the handwriting of appellant. While the appellant's bill shows as a ground of his objection that the State had not proved that it was in Thompson's handwriting, the facts in that connection are not stated. The bill, how-

ever, further shows that one Jack Carroll, had testified that he knew defendant Thompson's handwriting. Before a letter could have been excluded on this ground, the bill should have shown affirmatively that there was no proof that said letter was in the handwriting of the defendant Thompson. If we refer to the statement of facts, not only does the proof show that the letter was in the handwriting of the defendant Thompson, but its contents and the surrounding circumstances strongly corroborate this evidence.

The court allowed the State to bring before the jury a lot of money, which was shown to have been buried in the lot of Ed Whatley, and which the witness, Walton Whatley, testified was a part of the fruits of the robbery. Appellant objected to this testimony, on the general ground that it was immaterial, and that the only testimony which located the money was by the accomplice, Walton Whatley. In our opinion, this testimony was material, and the money was sufficiently identified for the purpose of presenting it in evidence before the jury. Moreover, the finding of this money buried in Whatley's lot, and its identification by Walton Whatley, was a circumstance strongly corroborative of the testimony of several other State's witnesses in this case. The appellant proposed to prove by Parker, on cross-examination, what Ed Whatley told him (Parker) about his connection with the robbery, this conversation being also in the presence of the appellant. The State is not shown to have introduced in evidence anything as to any conversation between Parker and Whatley; and, in the absence of such showing, we fail to see how the defendant could produce in evidence these statements of what Whatley had said as to the robbery. We believe it was proper for the State to have proved on cross-examination of the witness, Julia Eldridge, that she was the kept woman of Crain. This was testimony going to her discredit before the jury. The court permitted the State to prove, by the witnesses Redden and Parker, certain statements made by said defendant to them while he was in jail. This testimony, as shown by the court's explanation to the bill, was admitted after the defendant was on the stand and had testified, and was allowed by the court for the purpose of impeachment of defendant's testimony; and the court, in its charge, so limited the effect and purpose of said evidence. In this there was no error. Nor was there any error in permitting the witness, Darst, after the defendant had closed his testimony, to testify in the case. This testimony, perhaps, was not stricly in rebuttal, but no abuse of the discretion of the court appears in this regard. The judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant filed a motion for rehearing which was overruled without a written opinion.—Reporter.]