IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0438-12






ANTHONY WAYNE HACKER, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FOURTEENTH COURT OF APPEALS


HARRIS COUNTY





 Keller, P.J., delivered the opinion of the Court in which Price,
Womack, Johnson, Keasler, Hervey, Cochran and Alcalá, JJ., joined. Meyers,
J., did not participate.


 We must determine whether the evidence shows that appellant violated a "no contact"
condition of probation, when the condition allowed contact by telephone regarding issues of child
custody and when appellant and his wife had an arrangement for appellant to babysit their children
at his wife's home while she was at work. We conclude that the evidence fails to show that appellant
violated the "no contact" condition.

I. BACKGROUND


 On December 2, 2010, appellant was placed on deferred-adjudication probation for assaulting
his wife. Condition 22, the "no contact" condition of his probation, provided: 

You are not to contact the complainant, JENNIFER HACKER, in person, in writing,
by telephone, via the internet, a third party or any other means for any reason except
as specifically permitted by the Court. YOU MAY SPEAK TO HER VIA
TELEPHONE ONLY FOR THE PURPOSE OF CHILD CUSTODY ISSUES.

 The State filed a motion to revoke on the basis that appellant violated this condition. 

 The evidence at trial showed that appellant's orientation paperwork, filled out on December
15th, initially listed his home address as his wife's address, but that address was crossed out and his
brother's address was written in its place. Appellant testified that he had initially listed his wife's
residence as his own out of "force of habit" and not because he actually lived there. 

 Appellant's probation officer testified to a conversation that she had with appellant on
January 3, 2011. She asked appellant about the crossed-out address, (1) and he responded that his
brother had a spare bedroom and that appellant had a change of clothes and a toothbrush there. The
probation officer told appellant that she was concerned because he was not supposed to have any
contact with his wife other than by telephone. Appellant replied that he had not physically seen his
wife but that he talked to her on a daily basis about his children, whom he would pick up from
school. He said that he would call his wife to arrange a time to pick up the children and take them
to her home. He would then stay with them at the residence until she would call him and tell him
that she was on her way home. He would then leave before his wife arrived. Appellant said he spent
the night on occasion when his wife worked the night shift. Appellant told the probation officer that
he had had this arrangement with his wife since he was placed on probation on December 2nd. 

 Appellant's children were aged seventeen and fourteen. The probation officer testified that
appellant described the fourteen-year-old as mildly retarded. Appellant's wife testified that the
fourteen-year-old was a special-needs child with the mental age of an eight- or nine-year-old. 
Appellant's wife also testified that she worked in the emergency room at a hospital.

 The trial judge took judicial notice that a protective order had barred appellant from being
at his wife's residence and that the protective order ended on December 19th. Appellant and his wife
both testified that appellant first visited his wife's home on December 23rd. Appellant also testified
that his understanding of the "no contact" requirement was that he could not be living at his wife's
residence.

 The probation officer further testified that appellant had told her that he would not have pled
guilty if he had known what was in the offense report and that his wife had lied about what had
happened. Appellant's wife testified that she did not want the "no contact" condition and that it was
difficult on her. 

 The trial judge adjudicated appellant's guilt, stating on the record that she was making a
credibility finding in favor of the probation officer. In support of her conclusion that appellant
violated the conditions of probation, the trial judge stated that appellant had "violated the terms by
continual phone conversations on everything." The trial judge also stated her conclusion that
appellant was living at his wife's residence because, "You don't live where you have one change of
clothes." The trial judge sentenced appellant to four years in prison. 

 The court of appeals affirmed, holding that the evidence was sufficient to show that
"appellant engaged in prohibited contact with his wife." (2) The court reasoned that the evidence was
sufficient to show that appellant was living at his wife's residence because he kept most of his
belongings there and initially listed it as his own. (3) The court further reasoned that the evidence
supported a finding that appellant and his wife were attempting to conceal evidence when they
testified at trial that appellant did not visit his wife's residence until December 23rd. (4) "Having found
that appellant was living at his wife's residence," the court of appeals concluded, "the trial court
could have reasonably concluded appellant was in prohibited physical contact with his wife. In other
words, because appellant was living in the same residence as his wife, it is reasonable to infer they
came into contact with each other." (5) 

II. ANALYSIS


A. Standard


 To convict a defendant of a crime, the State must prove guilt beyond a reasonable doubt, (6) but
to revoke probation (whether it be regular probation or deferred adjudication), the State need prove
the violation of a condition of probation only by a preponderance of the evidence. (7) In the probation-revocation context, "a preponderance of the evidence" means "that greater weight of the credible
evidence which would create a reasonable belief that the defendant has violated a condition of his
probation." (8) Although a much lower standard than "beyond a reasonable doubt," the preponderance
of the evidence standard is a much higher standard than the search-and-seizure standards of
"probable cause" and "reasonable suspicion." (9)

 The State's burden of proof informs the appellate standard of review for legal sufficiency of
the evidence. (10) When the burden of proof is "beyond a reasonable doubt," an appellate court
reviews the evidence in the light most favorable to the prosecution and asks whether a rational jury
could have made the requisite finding beyond a reasonable doubt. (11) For issues governed by the less
rigorous burden of proof of "preponderance of the evidence," the appellate standard of review for
legal sufficiency is also less rigorous. For probation-revocation cases, we have described the
appellate standard of review as whether the trial court abused its discretion. (12) In addition, we have
explained that the trial judge is the sole judge of the credibility of the witnesses and the weight to
be given to their testimony. (13) In civil cases that are governed by the preponderance-of-the-evidence
burden of proof, the legal-sufficiency standard has been described as a review for whether there is
"more than a scintilla" of evidence. (14) Evidence does not meet this standard when "the evidence
offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of
its existence" (15) or when the finder of fact must "guess whether a vital fact exists." (16) Furthermore,
the Texas Supreme Court has explained, "some suspicion linked to other suspicion produces only
more suspicion, which is not the same as some evidence." (17)

 One practical way in which a legal-sufficiency review varies depending upon the burden of
proof in the underlying case is the treatment of extrajudicial confessions. When the burden of proof
is "beyond a reasonable doubt," a defendant's extrajudicial confession does not constitute legally
sufficient evidence of guilt absent independent evidence of the corpus delicti. (18) The corpus delicti
doctrine requires that evidence independent of a defendant's extrajudicial confession show that the
"essential nature" of the charged crime was committed by someone. (19) By contrast, in the probation-revocation context, controlled by the lesser, "preponderance of the evidence" burden of proof, an
uncorroborated extrajudicial confession may be sufficient to support revocation. (20) 

 But what happens when a defendant makes an extrajudicial statement that does not admit to
conduct that violates probation but from which one might possibly infer that such conduct took
place? In a concurring opinion, former Presiding Judge Onion suggested that, when the defendant's
extrajudicial statement does not admit to all of the allegations necessary to sustain the State's motion
to revoke, some sort of corroboration is required. (21) How to review the evidence when the
probationer does not confess to conduct that is a violation of probation is one of the questions
implicated in the present case.

B. Did Appellant Confess to Prohibited Contact? 


 But first, we address the State's contention that appellant did confess to conduct that was a
violation of probation.

1. Telephone Conversations


 At oral argument, the State claimed that appellant admitted to telephone communications that
were in violation of the conditions of probation. Acknowledging that the conditions contained an
exception for telephone communications about child custody, the State argued that the wife telling
appellant, "I'm coming home; it is time for you to leave," was not a statement made for the purpose
of child custody. So, the State contends, appellant's communications with his wife for the purpose
of avoiding physical contact with her while he obtained and relinquished custody over the children
were prohibited communications. 

 We disagree. These conversations related to the timing of the defendant's custody over the
children--when custody would begin and when it would end. Moreover, the State's position would
place appellant in a catch-22: He needed to know when to obtain and relinquish custody of his
children so that he could avoid physical contact with his wife, but because he was prohibited from
contacting his wife through a third party, he could obtain the needed information only if his wife
conveyed it to him over the telephone.

 The State also argued that appellant's telephone conversations violated the conditions of
probation because he "consistently talked to her on the phone on a consistent basis." But the
conditions of probation said nothing about the frequency of telephone conversations; the restriction
was only on their content. Appellant's admission that he talked to his wife on the telephone
frequently for the purpose of child custody was not an admission that he engaged in conduct that
violated his probation. (22)

2. Proximity


 The State contends that appellant's care of his children in his wife's home was an admission
of "proximity" contact to his wife. The State argues that appellant essentially lived in the wife's
home and that his arrangement with his wife made him a "looming presence" in her home. In
support of its contention, the State cites several out-of-state cases. (23) All of those cases except
MacDonald involved probationers who were physically near a protected person. (24) The MacDonald
case was not a proximity case at all; it merely referred to the concept of proximity in a manner
consistent with the other cases relied upon by the State. (25) The proximity cases cited by the State refer to a probationer's proximity to a person, not to
the person's property. They are inapposite because appellant never admitted to being physically near
his wife. At oral argument, Judge Cochran asked whether appellant could have cared for the children
at his wife's home without violating the "no contact" condition if his wife had gone to New Jersey
to help with the aftermath of Hurricane Sandy. The State conceded that staying at his wife's home
would not be a violation of the "no contact" condition under those circumstances. We agree with
this concession, and we further think that presence in his wife's home, even on a frequent basis, does
not by itself establish prohibited contact with his wife. To be sure, the term "contact" has a broad
meaning. Appellant was prohibited from contacting his wife in person, by mail, by email, or by any
other means. But simply occupying his wife's home when she was not there is not a prohibited
communication with his wife nor is it proximity to her. 

 The trial judge concluded that appellant was living at his wife's residence because all of his
property, other than a toothbrush and a change of clothes, was there. If what the trial judge meant
by this conclusion were simply that the arrangement described by appellant--keeping almost all of
his possessions at his wife's home and staying at the home on a frequent basis, though never at the
same time as his wife--should aptly be labeled as "living there," then it begs the question. However
one wants to label the arrangement described by appellant, that arrangement does not constitute
prohibited contact with his wife. (26) 

C. Can Prohibited Contact Be Inferred from the Evidence?


 Even though appellant did not admit to engaging in conduct that violated the "no contact"
condition, we must address whether such conduct can be inferred by the finder of fact from the
evidence. We turn to the evidence relied upon by the State and by the courts below.

1. Crossed-Out Address


 Even though appellant testified that he initially filled out the form with his wife's address out
of force of habit, the trial judge did not have to believe him. Nevertheless, while it is certainly
possible that appellant initially filled in his wife's address because it really was his current address,
such a conclusion would be mere speculation. At most, the crossed-out address would create
suspicion regarding appellant's current residence, but, given that the crossed-out address occurred
at the beginning of his probation when the requirement that he live elsewhere had only recently been
imposed, it would not even be strong suspicion. 

2. Appellant's Description of the Child Custody Arrangements


 Given the deferential nature of a sufficiency review, we accept the trial court's decision to
believe the probation officer's description of appellant's statements to her rather than the testimony
of appellant and his wife. Thus, we accept that appellant told the probation officer that his
arrangement with his wife to care for the children at her residence began when he was placed on
probation, on December 2nd, and that his statement is proof of that fact. We disregard contrary
testimony from appellant and his wife.

 The question, though, is whether it was rational to infer from appellant's statements
describing the custody arrangements that appellant engaged in other conduct that constituted
prohibited contact with his wife. For example, appellant admitted that he talked to his wife on the
telephone frequently for the purpose of arranging child custody. Would it be rational to infer from
this admission that appellant must have talked to his wife about other topics? Also, appellant said
that he frequently stayed at his wife's home to care for the children when she was not there and that
almost all of his possessions were there. Would it be rational to infer from these statements that
appellant must also have been at his wife's home when his wife was there?

 In its brief, the State contends that a finder of fact could draw inferences from the fact that
appellant "admittedly talked to his wife on the telephone on a regular basis." In concluding that
appellant engaged in "continual phone conversations on everything," the trial judge seems to have
drawn the inference that the telephone conversations, being frequent, must have involved matters
other than child custody. But neither the State, nor the trial court, nor the court of appeals has
explained how one can infer the content of telephone conversations from their frequency, and no
explanation is apparent to us. 

 Relying upon Rickels v. State, (27) the State contends that appellant's statements can at least be
used to infer that appellant was present in his wife's home while his wife was there. In Rickels, one
of the conditions of probation provided that the defendant could not be within 300 feet of premises
where children gather. (28) The evidence showed that the defendant lived in a house with a front door
that was 296 feet from an elementary school. (29) The bottom portions of the front windows were
covered by cardboard and a padlock was on the front door. (30) A probation officer testified that the
cardboard on the windows prevented him from seeing inside the probationer's home. (31) Rickels's
attorney argued that, because terrain and shrubbery interfered with the view of the school, there was
no evidence that Rickels even knew the school was there. (32) We held that the trial court could
rationally infer that the defendant was on a portion of his property that was within 300 feet of the
school from the fact that the defendant's front yard and front door were within that distance. (33) We
also held that the trial court could have reasonably inferred that, at some time during his probationary
term, the defendant was within four feet of his front door. (34) 

 We do not think that the inferences the State seeks to have us draw in the present case are
of the same quality as the inferences drawn in Rickels. (35) The condition that Rickels was found to
have violated prohibited him from going within 300 feet of certain kinds of premises, with no
exceptions. The condition that appellant was found to have violated prohibited him from contacting
a certain person, but it allowed a particular exception. The State would have us infer a violation of
the condition from an acknowledgment that appellant acted under the exception. If the condition in
Rickels had, for example, made an exception for Sundays, we would not have inferred from his
presence near a school on a Sunday that he had been near the school on other days.

 Appellant's statements that he took care of the children at his wife's home while she was
gone might be probative in combination with other evidence, depending on the nature of that other
evidence. If, for example, the State had introduced evidence of bruises on the wife's face, then
appellant's admission that he had been to his wife's house might be probative to show appellant as
the source of those bruises, and if he was the source of the bruises, then he engaged in prohibited
contact. But the State introduced no evidence that could demonstrate the prohibited contact itself. 

3. Motive and Opportunity


 As evidence supporting the trial court's decision to revoke probation, the State points to
appellant's statement that he would not have pled guilty if he had known what was in the offense
report, and it points to his wife's testimony that she did not want the "no contact" condition and that
it was difficult on her. This evidence has some tendency to show motive for appellant to have
prohibited contact, and the wife's testimony may also show opportunity to do so. We have said that
"[m]otive is a significant circumstance indicating guilt." (36) One court of appeals has aptly observed
that "proof of motive might be the glue that holds the entire case together." (37)

 But these statements are based upon the unstated assumption that there is evidence of
something to be "glued." We have held that motive and opportunity alone are not sufficient to
demonstrate that a fire was an arson committed by the defendant. (38) We have also held that motive
alone is not sufficient to corroborate the testimony of an accomplice. (39) And we have held that
evidence that a person other than the defendant had a motive to commit murder is not admissible
absent proof of opportunity to do so and some evidence tending to connect the other person to the
crime. (40) The holdings with respect to accomplice-witness testimony and the admission of evidence
support the notion that the issue is not simply one of sufficiency under a reasonable doubt standard
but whether motive, by itself, even qualifies as some evidence.

 Evidence of motive helps link a defendant to wrongful conduct or is supportive of other
evidence of such conduct. The same is true of evidence of opportunity. But without evidence that
wrongful conduct has occurred, there is nothing for motive and opportunity evidence to link the
defendant to. If, for example, John has a motive for murdering Mary, but there is no evidence that
Mary is dead (much less evidence that her death was a homicide), then John's motive is meaningless. 
His motive alone does not establish that a murder occurred, and the motive cannot link John to a
murder without evidence that there was a murder. Motive alone is not even some evidence of a
murder that could be used to revoke John's probation.

 As we explained in Part 2 above, the State did not introduce any evidence that would
establish that prohibited contact occurred. Without that, appellant's motive and opportunity to
engage in prohibited contact is not evidence that he actually did so.

4. Perjury


 The State and the court of appeals also suggest that appellant and his wife attempted to
conceal evidence by giving false testimony about the date appellant began visiting his wife's home
to care for the children and about how much property he left there. Relying upon Wright v. West, (41)
the State contends that the trial judge was entitled to consider "whatever it concluded to be perjured
testimony as affirmative evidence of guilt." (42)

 In Wright, the Supreme Court did indeed hold that perjured testimony could be affirmative
evidence of guilt. (43) The Court cited, as examples, Wilson v. United States, (44) United States v. Zafiro, (45)
and Dyer v. MacDougall. (46) In Wilson, the Supreme Court stated that the jury could regard "false
statements in explanation or defence made or procured to be made as in themselves tending to show
guilt. The destruction, suppression or fabrication of evidence undoubtedly gives rise to a
presumption of guilt to be dealt with by the jury." (47) In Zafiro, the Seventh Circuit, in an opinion by
Judge Posner, explained that a defendant did not have to testify, "but if he does and denies the
charges and the jury thinks he's a liar, this becomes evidence of guilt to add to the other evidence." (48) 
And in Dyer, the Second Circuit, in an opinion by Judge Learned Hand, stated that a denial of
wrongful conduct "may be uttered with such hesitation, discomfort, arrogance or defiance, as to give
assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of
what he denies." (49)

 But in Wright, Wilson, and Zafiro the fact that a crime had occurred was established by other
evidence. In Wright, a home had been burglarized. (50) Wilson was a murder prosecution, and there
was a dead body. (51) And in Zafiro, illegal drugs were found in the home. (52)

 Dyer was an appeal from the granting of summary judgment to the defendant in a civil suit
alleging slander. (53) The Second Circuit explained that, if the case went to trial, the plaintiff would
have no witnesses to prove slander except for the two defendants, who would deny that the slanders
had been uttered. (54) Upholding the summary judgment, the court said that, although "in strict theory
a party having the affirmative might succeed in convincing a jury of the truth of his allegations in
spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless
have to be directed against him." (55) So, Dyer is a case in which false testimony was held to be
insufficient, and if one examines the facts, it is also a case in which the fact that wrongful conduct
had occurred was not established because the plaintiff had no evidence that a slander had been
uttered. We conclude that, as with evidence of motive, evidence of perjury can be significant linking
evidence when it has been established that a separate crime or wrongful conduct has occurred, but
the commission of perjury is not, by itself, sufficient to infer that a separate crime or wrongful
conduct has occurred. (56)

 The present case involves more than just testimony that is believed to be false; it involves
testimony that conflicts with an earlier, extrajudicial statement. But we have already accepted the
earlier, extrajudicial statement as true for purposes of conducting a sufficiency review and have
determined that it does not establish a violation of the "no contact" order. The State seeks to use the
alleged perjury about the date appellant began visiting his wife's home to care for the children and
about how much property he left there to infer the existence of a collateral fact--whether appellant
was present in the home at the same time as his wife. (57) But as in Dyer, we cannot infer this fact from
the linking evidence of the alleged perjury. 

5. Violating the Protective Order


 Finally, the State contends that the evidence shows that appellant violated a protective order
that barred him from being at his wife's residence because the evidence shows that he was at his
wife's residence before December 19th. The State candidly admits that violation of the protective
order is not enough to revoke appellant's probation because the motion to revoke did not allege a 
violation of the law, but the State argues that it is a circumstance to consider. 

 But any purpose that might be served by such evidence--such as proving motive, intent, or
even character conformity (setting aside any potential admissibility issues) (58)--would not be
probative absent evidence that conduct occurred that would be a violation of the "no contact"
condition, the violation that was alleged in the State's motion. We have already discussed motive;
intent, at least as it would be used here, raises the same concerns. Appellant's state of mind is
unimportant if the existence of the prohibited conduct has not been established, just as a murder
defendant's state of mind is unimportant if there is no evidence that the alleged victim is dead. 

 And like motive, a character-conformity inference is one that links the defendant to an act
that has been shown to have occurred. It does so by using a prior act to link the defendant to a
subsequent act, but if there is no evidence that the subsequent act occurred, then it is impossible to
determine that the defendant acted in conformity with his prior behavior. For example, John's
murder of Fred as character-conformity evidence to show that he also murdered Mary makes sense
only if it is shown that Mary is dead and we are trying to ascertain whether John killed her. 
Otherwise, one could just draw a name out of a hat and say, "You killed Fred, so you must have
killed this person also because I have not seen him lately."

6. Combined Weight of the Evidence


 Appellate courts are not permitted to use a "divide and conquer" strategy for evaluating
sufficiency of the evidence. (59) Rather, a reviewing court must consider the combined and cumulative
force of all the evidence. (60) But the State cannot prevail under the combined and cumulative force
of all of the evidence in the present case because the State failed to introduce evidence that any
prohibited conduct had occurred. What the State had here was just linking-type evidence. Appellant
had motive and opportunity for prohibited contact because he expressed buyer's remorse about
pleading guilty and his wife did not want the "no contact" order. Appellant lied about collateral
issues regarding when the child-care arrangement began and how much property of his remained at
the residence. Appellant violated the protective order, which might show motive, intent, or even
character. The State also had other circumstantial evidence that was perhaps suspicious but did not
establish the fact of prohibited contact: the crossed-out address, appellant's admission to being
present at his wife's house when she was not there, and appellant's admission to frequent telephone
conversations with his wife about child-custody matters.

 None of this evidence established that prohibited contact occurred. Without that, all of this
evidence was mere "suspicion linked to other suspicion." (61) We hold that the evidence was legally
insufficient to meet the State's allegation in its motion to revoke, and therefore, the trial court abused
its discretion in revoking appellant's probation. We further hold that the court of appeals erred in
upholding the trial court's judgment in doing so. We reverse the judgments of the courts below, and
we order that the State's motion to revoke probation be dismissed.

Delivered: January 16, 2013

Publish
1. When asked on cross-examination if appellant could have written his wife's address out
of habit and crossed it out when he realized he was not living there, the probation officer replied,
"That could have happened."
2. Hacker v. State, No. 14-11-00146-CR, slip op. at 4 (Tex. App.-Houston [14th Dist.]
February 16, 2012) (not designated for publication).
3. Id.
4. Id.
5. Id. at 5.
6. Tex. Penal Code § 2.01.
7. Leonard v. State, 2012 Tex. Crim. App. LEXIS 1598, at 14 (November 21, 2012); Ex parte
Doan, 369 S.W.3d 205, 210 (Tex. Crim. App. 2012). 
8. Rickels v. State, 202 S.W.3d 759, 764 (Tex. Crim. App. 2006).
9. York v. State, 342 S.W.3d 528, 543 n.86 (Tex. Crim. App. 2011).
10. Brooks v. State, 323 S.W.3d 893, 910 n.41 (Tex. Crim. App. 2010) (noting that that "civil
appellate standards of 'legal' and 'factual' sufficiency are moving in the direction of essentially a
Jackson v. Virginia standard as the burden of proof at trial increases"); City of Keller v. Wilson, 168
S.W.3d 802, 817 (Tex. 2005) ("As we recently stated, the standard for legal sufficiency works in
tandem with the standard of review--'whenever the standard of proof at trial is elevated, the
standard of appellate review must likewise be elevated.'"). 
11. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).
12. Rickels, 202 S.W.3d at 763.
13. Davila v. State, 547 S.W.2d 606, 609 (Tex. Crim. App. 1977).
14. Jelinek v. Casas, 328 S.W.3d 526, 532 (Tex. 2010).
15. Id.
16. City of Keller, 168 S.W.3d at 813.
17. Marathon Corp. v. Pitzner, 106 S.W.3d 724, 728 (Tex. 2003).
18. Bible v. State, 162 S.W.3d 234, 246 (Tex. Crim. App. 2005).
19. Id.
20. Bush v. State, 506 S.W.2d 603, 605 (Tex. Crim. App. 1974); Smith v. State, 160 Tex.
Crim. 438, 439-40, 272 S.W.2d 104, 105-06 (1954) (confession, uncorroborated as to the corpus
delicti, constitutes sufficient grounds for revocation).
21. Coleman v. State, 505 S.W.2d 878, 881-82 (Tex. Crim. App. 1974) (Onion, P.J.,
concurring).
22. The State's argument may also be construed as saying that a finder of fact could infer from
the frequency of the calls that appellant and his wife had discussions unrelated to child custody. We
address that question later in this opinion. 
23. People v. Devorss, 277 P.3d 829, 836 (Colo. App. 2011); Commonwealth v. Kendrick, 841
N.E.2d 1235, 1239 (Mass. 2006); Commonwealth v. Wilcox, 823 N.E.2d 808, 810 (Mass. App. Ct.
2005), aff'd 841 N.E.2d 1240 (Mass. 2006); State v. Danaber, 819 A.2d 691, 694-95 (Vt. 2002);
Commonwealth v. MacDonald, 736 N.E.2d 444, 447 n.7 (Mass. App. Ct. 2000), aff'd, 757 N.E.2d
725 (Mass. 2001); State v. Leggett, 709 A.2d 491, 493 (Vt. 1997).
24. Devorss, 277 P.3d 836-37 ("No contact" condition prohibited the probationer from
"sitting in close proximity to a child under the age of eighteen years, even where he does not
make eye contact with the child, communicate with the child, or physically touch the child" and
"must be read to prohibit his decision to sit adjacent to a child in a restaurant booth."); Kendrick,
841 N.E.2d at 1239 (The "no contact" condition requires the probationer "to avoid encountering
or engaging children in any way; to refrain from attendance at places where proximity to, and
thus an encounter with, children is likely; and promptly to remove himself from such proximity if
an encounter arises unexpectedly. The condition is not, as the defendant suggests, simply a
requirement not to touch or speak to a child." The defendant attended an antique car show where
children were present, sat near a food concession stand, displayed his antique car, and brought his
dog with him and allowed it to wander through the crowd.); Wilcox, 823 N.E.2d at 810
(Probationer violated "no contact" condition when he drove his car close to a fourteen-year-old
girl as she walked home from school and, thereafter, stared at that girl and two other young girls
from within a small grocery store and, then, followed them back to the home of one and
repeatedly drove around the block.); Danaber, 819 A.2d at 694 (Probationer was in close
physical proximity to the child victim, whom he was not supposed to contact, at a residence and
then later at a bus stop.); Leggett, 709 A.2d at 493 (Despite the fact that "no contact" order
prohibited probationer from having contact with children under age sixteen, probationer did not
leave the home of a seven-year-old child, when another child, under age sixteen, visited. Also,
probationer attended a Super Bowl party where the seven-year-old was present.).
25.  The probationer had sent the protected person a letter, and the appellate court found that
the trial court had imposed a "stay away" order rather than a "no contact" order.  MacDonald, 736
N.E.2d at 446-48.  In a footnote, the court discussed the difference between these two types of
orders: a "stay away" order is satisfied so long as there is no physical proximity between the
probationer and the protected person, but a "no contact" order requires, in addition, that the
probationer not communicate with the protected person by speech, writing, or any other means.  Id.
at 447 n.7. 
26. Whether physical proximity can be inferred from what appellant did say is a subject that
we discuss later in this opinion.
27. 202 S.W.3d 759 (Tex. Crim. App. 2006).
28. Id. at 762.
29. Id. at 764.
30. Id. at 760 n.2.
31. Id.
32. Id. at 761. 
33. Id.
34. Id.
35. Caselaw includes examples of living arrangements and relationships that are not the
norm but that, nevertheless, are insufficient to support an inference that something else must be
going on. See Brown v. Apfel, 60 Soc. Sec. Rep. Service 217, 1999 U.S. Dist. LEXIS 2976, at 8-9 (S.D.N.Y. 1999) (Administrative law judge's determination that the plaintiff was married for
the purpose of SSI benefits was not supported by substantial evidence even though he cohabited
with the mother of his child when the undisputed testimony of both the plaintiff and the woman
was that they had never considered themselves to be married.); In re Wilbur, 206 B.R. 1002,
1007 (Bankr. M.D. Fla. 1997) (Despite bankruptcy trustee's contention that debtor "keeps most
of his personal property in storage," court concluded that "homestead status cannot be denied
because Debtor keeps some of his personal property in a storage facility."); Brodus v. State, 449
So. 2d 941, 942 (Fla. Dist. Ct. App. 1984) (Condition of probation that prohibited the defendant
from living with a member of the opposite sex who was not a family member was overly broad
because it did not take into account the "innocent roommate" situation in which two or more
share a house and split the rent.); Clements v. Clements, 21 Pa. D. & C. 661, 662 (1934)
(disagreeing with master's conclusion that the facts did not show justification for wife's
desertion because evidence showed that husband boycotted his wife "in all the elementary
relations and amenities of marital life" and where husband himself admitted, "While we were
both living in the same house, we lived in different rooms and had no contact with each other at
all."). While the facts in Clements would be sufficient to show "contact" for purposes of a "no
contact" condition of probation, this case, plus the others cited, illustrate the variability with
which living arrangements can occur. 
36. Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).
37. See Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting from the court
of appeals's opinion).
38. Merritt v. State, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) ("motive and opportunity
are not elements of arson and are not sufficient to prove identity"); Massey v. State, 154 Tex. Crim.
263, 268-69, 226 S.W.2d 856, 859 (1950) ("But motive and opportunity, alone, are not sufficient to
establish that he set fire to the building. There must be some testimony showing that the fire was
of incendiary origin--that is, that someone willfully burned the building."). See also Umstead v.
State, 435 S.W.2d 156, 158 (Tex. Crim. App. 1968) (citing Massey).
39. Leal v. State, 782 S.W.2d 844, 852 (Tex. Crim. App. 1989); Umstead, 435 S.W.2d at 158.
40. Spence v. State, 795 S.W.2d 743, 754-55 (Tex. Crim. App. 1990); Porch v. State, 50 Tex.
Crim. 335, 342, 99 S.W. 102, 106 (1906); Thompson v. State, 35 Tex. Crim. 511, 34 S.W. 629, 523
(1896).
41. 505 U.S. 277 (1992).
42. State's brief, quoting Wright, 505 U.S. at 296.
43. Wright, 505 U.S. at 296.
44. 162 U.S. 613 (1896).
45. 945 F.2d 881 (7th Cir. 1991), aff'd on other grounds, 506 U.S. 534 (1993).
46. 201 F.2d 265 (2d Cir. 1952).
47. 162 U.S. at 621.
48. 945 F.2d at 888.
49. 201 F.2d at 269.
50. 505 U.S. at 295.
51. 162 U.S. at 613-14.
52. 945 F.2d at 888.
53. 201 F.2d at 266.
54. Id. at 268.
55. Id. at 269.
56. We note, however, that in a prosecution for perjury, the false statement is itself the corpus
delicti. Martinez v. State, 91 S.W.3d 331, 340 (Tex. Crim. App. 2002).
57. We also point out that appellant had an obvious motive to lie about when the custody
arrangement began and how much of his property was at his wife's residence for reasons that did not
necessarily inculpate him as violating the "no contact" condition. The probation officer was
obviously dissatisfied with the arrangement as appellant had originally explained it, and the State
has taken the position that the explained arrangement was itself a violation of the conditions of
probation.
58. See Tex. R. Evid. 404(b).
59. Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
60. Garcia v. State, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012). 
61. See this opinion, footnote 17.