Jesse VILLARREAL, Appellant,

v.

The STATE of Texas, Appellee.

No. 59515.

Court of Criminal Appeals of Texas, En Banc.

Dec. 13, 1978.

Rehearing En Banc Denied Feb. 7, 1979.

Donald B. Dailey, Jr., Corpus Christi, for appellant.

William B. Mobley, Jr., Dist. Atty. and Eric G. Brown, Asst. Dist. Atty., Corpus Christi, for the State.

## OPINION

DALLY, Judge.

Appellant was convicted of capital murder following a change of venue from Nueces County. The punishment was assessed at death.

Appellant contends that the trial court erred: (1) in refusing to instruct the jury that two witnesses were accomplice witnesses as a matter of law, (2) in finding a deaf witness was competent to testify, (3) in refusing to instruct the jury concerning evidence of threats to witnesses, (4) in failing to grant a mistrial after an officer testified that a confidential informer's life had been threatened, (5) in admitting evidence unlawfully obtained after incorrectly holding it was obtained by consent, (6) in admitting hearsay evidence, (7) in allowing an expert witness to testify outside of the range of his expertise, (8) in excusing a prospective juror in violation of the constitutional principles and the holding in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), (9) in excusing a prospective juror on the grounds she was not physically capable of serving, (10) in failing to grant a mistrial because of the prosecutor's improper jury argument, (11) in failing to require the State to disclose exculpatory evidence to the defense.

Appellant was accused of murdering Norma Guevara, a clerk in a Corpus Christi convenience store, while in the course of committing robbery. The bodies of the deceased and a fellow employee were discovered by customers who entered the Maver-

ick Market store at approximately 9:45 p. m. on March 24, 1975. Both victims were lying face down on the floor of a storeroom; both had been shot in the back. The store's safe was found open, and a bag containing money received from the sale of money orders had been taken.

Elva Garcia testified that on March 21, 1975, she rented two apartments in the Twin Palms Motel in Corpus Christi. She and her boyfriend stayed in apartment twelve, while her daughter, Lucy Gonzales, and appellant stayed in apartment ten. Also living in apartment ten were Garcia's son, Frederico Gonzales, and his girlfriend.

At 5:00 p. m. on March 24, Lucy and appellant left the motel in Garcia's car. They returned at approximately 10:00 p. m. Appellant entered apartment twelve and placed an object wrapped in a red handkerchief under the bedspread. He then left the apartment after telling Lucy to stay there. A few minutes later, Lucy left the apartment. As Garcia stood in the door, she heard Lucy ask appellant, "Where gun?" Appellant pointed toward the beach and said in Spanish that he had disposed of the evidence.

Garcia, Lucy, and appellant re-entered apartment twelve, and appellant removed the bundle from under the bedspread. The bundle was a bank bag, from which appellant removed and began counting money. A few minutes later, Frederico Gonzales entered the apartment. Appellant gave him twenty dollars to buy beer. Later, Frederico, Lucy, and appellant left the apartment to go to the N.G.N. Lounge.

Lucy Gonzales testified that she and appellant went to the N.G.N. Lounge after they left the motel on the afternoon of March 24. After leaving the lounge, appellant stopped the car, opened the hood, and removed a package. This package contained a gun, which appellant loaded and put in his belt. Appellant then drove to the Maverick Market. Appellant told Lucy to wait and then entered the store. He returned carrying a bank bag wrapped in a red handkerchief. Appellant placed the bag under the seat and drove away rapidly.

Lucy's testimony with regard to the events which occurred after she and appellant returned to the Twin Palms Motel was similar to that of Elva Garcia.

Frederico Gonzales testified that he was in apartment ten when Lucy and appellant returned to the motel on the night of March 24. A few minutes after their return, he looked through a window into apartment twelve and saw appellant sitting on the bed counting money. After Frederico entered apartment twelve, appellant gave him twenty dollars and told him to buy a case of beer. Frederico, Lucy, and appellant later went to the N.G.N. Lounge where appellant bought several rounds of beer for the house.

On March 25, Lucy, Frederico, Frederico's girlfriend, and appellant went shopping. Appellant bought several items of clothing for Lucy, Lucy's baby, and himself, paying cash. Later that day, Frederico and appellant went to the N.G.N. Lounge. Appellant was arrested when he and Frederico returned to the motel.

Natividad Nigreta, the owner of the N.G.N. Lounge, testified that when Lucy Gonzales and appellant were in the lounge on the afternoon of March 24 she heard appellant tell a man that if he would do a job, he could make $500. The man responded by saying he wanted to leave. During this first visit to the lounge, appellant bought beer on credit, but when he returned with Lucy and Frederico Gonzales that night he bought several rounds of beer for the house. Appellant also spent a large sum of money when he and Frederico were at the lounge on March 25.

Corpus Christi police searched the area in and around the Twin Palms Motel following appellant's arrest. They found a .38 caliber pistol under apartment seven, and a box of .38 caliber bullets under apartment ten. Lucy Gonzales identified the pistol as the one she saw appellant carrying on the night of March 24. An F.B.I. firearms expert testified that this pistol fired one of the bullets removed from the body of Norma Guevara. The other bullets recovered from the bodies of the victims were too damaged to make a comparison. The bank bag re-

moved from the safe at the Maverick Market was found under a piece of concrete pipe in a vacant lot approximately sixty yards from the motel.

The question of whether Elva Garcia, Lucy Gonzales, and Frederico Gonzales were accomplice witnesses was submitted to the jury as a question of fact. Appellant contends that the trial court erred by refusing to instruct the jury that Elva Garcia and Lucy Gonzales were accomplice witnesses as a matter of law. He argues that Elva Garcia was an accomplice witness because she accepted money from appellant knowing that it had been taken in the robbery. He argues that Lucy Gonzales was an accomplice witness because she was present in the car during the fatal course of events on March 24, and permitted appellant to buy her and her baby clothes with money taken in the robbery.

The record reflects that before Elva Garcia accepted the money appellant told her that he had committed a robbery at a small store and that no one had been hurt. The record does not reflect when Lucy Gonzales learned of the murders. She is a deaf mute, and could not have heard the shots while she waited in the car outside the Maverick Market.

An accomplice witness is someone who has participated with another before, during, or after the commission of a crime. *Jackson v. State*, 552 S.W.2d 798 (Tex.Cr. App.1977); *Singletary v. State*, 509 S.W.2d 572 (Tex.Cr.App.1974). One is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Easter v. State*, 536 S.W.2d 223 (Tex.Cr.App.1976); *Morgan v. State*, 171 Tex.Cr.R. 187, 346 S.W.2d 116 (1961); *Silba v. State*, 161 Tex.Cr.R. 135, 275 S.W.2d 108 (1954); *Liegois v. State*, 73 Tex.Cr.R. 142, 164 S.W. 382 (1914). A witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. *Easter v. State*, supra; *Gausman v. State*, 478 S.W.2d 458 (Tex.Cr. App.1972).

*Ballard v. State*, 519 S.W.2d 426 (Tex.Cr. App.1975), was a conviction for murder under the former penal code. During the course of the criminal transaction, several items of property were taken from the deceased's home. This Court held that a witness who received an item of the stolen property, knowing it to be stolen, was not an accomplice witness to the offense of murder:

"We are not presented here with the question of whether Dempsey would be an accomplice witness in the trial of the appellant for acquiring the diamond ring by committing the offense of robbery or theft. The question is whether Dempsey was an accomplice witness in the appellant's trial for murder. Since there is no evidence to show that Dempsey was an accomplice, principal, or accessory to the murder of Currie, he is not an accomplice witness in the trial of the appellant for the murder of Currie. See *Ham v. State*, 4 Tex.App. 645 (1878); *Warren v. State*, 60 Tex.Cr.R. 468, 132 S.W. 136 (1910); *Liegois v. State*, 73 Tex.Cr.R. 142, 164 S.W. 382 (1914); *Chandler v. State*, 89 Tex.Cr.R. 599, 232 S.W. 337 (1921); *Carnathan v. State*, 478 S.W.2d 490 (Tex.Cr. App.1972); 23 C.J.S. Criminal Law § 786(2). Cf. *Washburn v. State*, 167 Tex.Cr.R. 125, 318 S.W.2d 627 (1958); *Morgan v. State*, 171 Tex.Cr.R. 187, 346 S.W.2d 116 (1961)."

*Caraway v. State*, 550 S.W.2d 699 (Tex. Cr.App.1977), was also a prosecution for murder under the former code. In that case, a witness, Bell, had taken part in two thefts shortly before the murder, and had waited outside after the accused entered the house in which the murder took place. This Court held that:

"The mere fact that a witness has complicity with an accused in the commission of other offenses does not make his testimony that of an accomplice witness for the offense for which the accused is on trial if there is no showing of his complicity in that offense. [citing *Easter v. State*, supra]. The record in the instant case does not reflect any affirmative act on Bell's part to assist in Knox's murder. See *Chappell v. State*, Tex.Cr.App., 519

S.W.2d 453. Appellant made no showing that Bell participated in planning or promoting the offense. See and compare *Cross v. State*, Tex.Cr.App., 550 S.W.2d 61 (decided April 20, 1977). Even if Bell had been told of the killing later that evening when he was given a ride by appellant and Bates, a witness is not deemed an accomplice witness merely because he knew of the crime but failed to disclose it or even concealed it. *Easter*, supra. The fact that Bell was present outside the farm house at the time of the shooting is also not controlling; the fact that the witness was present when the crime was committed does not compel the conclusion that he was an accomplice witness. See *Quintanilla v. State*, Tex.Cr.App., 501 S.W.2d 329; *Easter*, supra; [*Colunga v. State*, 527 S.W.2d 285 (Tex.Cr.App.1975)]."

██ The trial court did not err in refusing to charge that Elva Garcia and Lucy Gonzales were accomplice witnesses as a matter of law, nor was it necessary that the trial court submit that issue to the jury. *Caraway v. State*, supra; *Ballard v. State*, supra; and authorities cited therein. See also *Ferguson v. State*, 573 S.W.2d 516 (No. 58,706, delivered 9/20/78); *Jackson v. State*, supra; *Singletary v. State*, supra; *Hunt v. State*, 492 S.W.2d 540 (Tex.Cr.App. 1973); *Silba v. State*, supra. Having received a charge on accomplice witnesses more favorable than that to which he was legally entitled, appellant's grounds of error with regard thereto are without merit.

Appellant contends that Lucy Gonzales was incompetent to testify under Art. 38.06, Sec. 2, V.A.C.C.P., and that the trial court erred in overruling his motion to disqualify her as a witness. The record discloses that Lucy Gonzales is a deaf mute, and attended the Texas School for the Deaf from 1963 through 1969. James Howze, the assistant superintendent of the school, testified that her intelligence quotient was on the borderline of dull to normal, and that her reading ability was that of a first or second grade student. Howze also testified that students at the school were taught that it was wrong

to lie, and that they would be punished for lying. He stated that on the basis of his review of Lucy Gonzales' record he believed that she would understand the nature of an oath and would know the difference between truth and falsity.

Lucy Gonzales testified, both at the pretrial hearing on her competency as a witness and at the trial itself, through an interpreter. At the pretrial hearing, she did not respond when asked by defense counsel if she knew the meaning of the word "oath." She did testify, however, that she had been taught to tell the truth and would do so in the courtroom.

██ The competence of a witness to testify is a question for the trial court, and we will not disturb its ruling on appeal unless an abuse of discretion is shown by a review of the entire record, including the witness' trial testimony. *Clark v. State*, 558 S.W.2d 887 (Tex.Cr.App.1977); *Provost v. State*, 514 S.W.2d 269 (Tex.Cr.App.1974); *Fields v. State*, 500 S.W.2d 500 (Tex.Cr.App. 1973). Although Lucy Gonzales was able to testify during the trial only in simple terms, and relied heavily on photographic exhibits, she was fully able to relate her experiences. We hold that the trial court did not abuse its discretion in permitting her to testify.

During his cross-examination of Elva Garcia, defense counsel questioned her with regard to several pretrial conversations during which she allegedly admitted to him that she had lied in her statements to the police and indicated that she did not want to testify at the trial. During the course of this cross-examination, the following exchanges took place:

"Q. Did you tell me, you did not want to commit perjury and you did not want Jesse [the appellant] to go to the electric chair for something you knew someone else had done?

"A. I didn't say, I didn't want to commit perjury, sir. I wanted to talk to you, because I wanted to find a lawyer as I wanted to take the Fifth Amendment, and because my daughter had been shot. And I don't want to jeopardize my daugh-

ter's and my son's lives, that's the reason for it.

"Q. We will get to that, later.

\* \* \* \* \* \*

"Q. —aren't you trying to protect Freddie [Frederico Gonzales]?

"A. No, sir; I am trying to protect both of them as something might happen to them. And, right now, I don't know anything about my son and I am afraid something might have happened to him.

"Q. If you are afraid; who are you afraid of?

"A. When this all happened, I had a lot of threatening calls; and my tire walls and windows and all were smashed in; and lots of people called me and say, something is going to happen to me or my daughter and after—after this happened, that's when my daughter was shot.

"Q. Who are you afraid of?

"A. I don't know.

"Q. It was not Jesse?

"A. Friends of his, probably.

"Q. What do you mean 'probably'; do you know?

"A. I wouldn't know, for sure; and how someone come for him and my daughter was shot, after what happened.

"Q. Mrs. Garcia, you came to me and told me, where you were. If you were afraid of Jesse, why did you tell me where you were?

"A. Because you would probably not jeopardize my life, because you're a lawyer.

\* \* \* \* \* \*

"Q. Well, let me ask you this: Are you saying that the reason why you would take the Fifth Amendment after that, the reason you wanted to take that Fifth Amendment was because you are scared?

"A. That is right."

Following this cross-examination the State questioned Elva Garcia on redirect examination with regard to her out-of-court conversations with defense counsel and the threats and attacks against her and her children. Appellant did not object to this questioning. The State also questioned Frederico Gonzales on these matters without any objections being made. Finally, after defense counsel personally testified to these out-of-court conversations, the State cross-examined him with regard to his knowledge of the threats.

Appellant requested that the trial court charge the jury not to consider testimony concerning threats and attacks against witnesses as evidence of appellant's guilt unless other evidence showed that he had been responsible for them. This request was refused.

A trial court may refuse to exclude from the jury's consideration evidence elicited on cross-examination by the defendant or that was admitted without objection. *Hogan v. State*, 147 Tex.Cr.R. 75, 178 S.W.2d 525 (1944); *Hart v. State*, 130 Tex. Cr.R. 174, 93 S.W.2d 157 (1936); *Gray v. State*, 77 Tex.Cr.R. 221, 178 S.W. 337 (1915); *Moxie v. State*, 54 Tex.Cr.R. 529, 114 S.W. 375 (1908). See also 31 Tex.Jur.2d, Instructions, Sec. 117. Furthermore, evidence that a witness has been threatened or is in fear for his personal safety may be admissible to explain prior inconsistent statements by the witness. *Brown v. State*, 505 S.W.2d 850 (Tex.Cr.App.1974); *Ayres v. State*, 105 Tex. Cr.R. 15, 284 S.W. 960 (1926); *Thompson v. State*, 35 Tex.Cr.R. 511, 34 S.W. 629 (1896). Since it was appellant who first elicited testimony with regard to the threats and attacks against the State's witnesses, and since appellant sought to impeach these witnesses through their inconsistent out-of-court statements, the trial court did not err in refusing the requested limiting instruction.

Corpus Christi police officer Edward Garza, one of the officers who arrested appellant, testified that he had received information with regard to the case from an informer. During cross-examination, Garza refused to disclose the name of this informer. During re-direct examination, the prosecutor asked Garza:

"Q. Mr. Bradshaw was trying to ask you something about your informant on his cross examination, Sgt. Garza, and would you tell this jury, why you are reluctant to acknowledge and give out the name of an informant, on this particular case?

"A. Yes; I am reluctant to give out the name, because the life has been threatened on this informant, twice, already.

"MR. BRADSHAW: If Your Honor please, I don't know what this has to do with any issue in this case. And I object, I object to this question. And I request to the Court instruct the jury to disregard the answer.

"THE COURT: I sustain the objection. The jury is instructed to disregard the witness's answer.

"MR. BRADSHAW: Your Honor, I move for a mistrial.

"THE COURT: I deny your motion for mistrial. But I reiterate to the jury, again, not to consider the witness's last answer."

■ Appellant contends that the trial court erred in overruling his motion for a mistrial. Although the prosecutor's question referred to "this particular case," Garza's answer did not expressly indicate that the threats on the informer's life had come from appellant or had in any way been connected to this case. In light of the trial court's prompt instruction that the jury disregard the witness' answer, and the fact that appellant subsequently elicited extensive testimony with regard to threats against the State's witnesses during his cross-examination of Elva Garcia, reversible error is not presented. See *Brown v. State*, 505 S.W.2d 850 (Tex.Cr.App.1974); *Bermudez v. State*, 504 S.W.2d 868 (Tex.Cr.App. 1974).

■ Officer Garza testified that following appellant's arrest on March 25 he had a conversation with Lucy Gonzales and Elva Garcia at the Twin Palms Motel. During the course of this conversation, he requested their consent to search the two apartments. He also read aloud a consent to search form which explained the constitutional right to be free from warrantless searches, and Garcia explained the form to Lucy in sign language. Garcia testified that she told Lucy that she did not have to sign the form but that it was all right to do so. Garcia also told Lucy that she, Garcia, was going to sign such a consent form. Lucy then signed the consent, and the officers present conducted a brief search of apartment ten. The parties then went to the police station, where Lucy and Garcia were questioned.

On the following morning, Lucy and her mother met Garza and Wayne Broughton, another officer, at the police station. After Lucy was further questioned through an interpreter, the parties returned to the Twin Palms Motel and entered apartment ten. The officers asked Lucy to show them the clothes that appellant had worn on the night of March 24. Lucy then handed the officers a maroon jacket and a red handkerchief. Appellant contends that these items were unlawfully seized because Lucy's consent to search was not knowingly and voluntarily given and that the trial court erred by admitting the items into evidence.

That Lucy Gonzales had the authority to consent to the search of apartment ten is undisputed. Although Lucy's testimony on the motion to suppress was confusing, the question of whether her actions were voluntary may be determined from the totality of the circumstances. *Kolb v. State*, 532 S.W.2d 87 (Tex.Cr.App.1976); *Resendez v. State*, 523 S.W.2d 700 (Tex.Cr.App.1975); *Stephenson v. State*, 494 S.W.2d 900 (Tex. Cr.App.1973). The evidence establishes that Lucy and her mother were cooperating with the police. On the morning in question, they voluntarily went to the police station for questioning. The police did not themselves search for the coat and handkerchief; these items were given to the police by Lucy after the parties returned to the motel. Regardless of whether or not Lucy understood the content and meaning of the consent form, the totality of the circumstances supports the conclusion of the trial

court that Lucy Gonzales voluntarily gave the coat and handkerchief to the police. *Stephenson v. State*, supra; *Sorensen v. State*, 478 S.W.2d 532 (Tex.Cr.App.1972). Cf. *Kolb v. State*, supra.

Officer Joe Solice testified that he was in charge of the records section of the Corpus Christi Police Department. He stated that a computer card is prepared each time a citizen calls the police, and identified two such cards. These cards had been prepared when two customers at the Maverick Market called the police following the murder. Among other things, the cards show the name of the caller, the time the call was received, and which officer was dispatched to answer the call. On one of the cards, the words "murder & amd robbery" are written. Solice testified that he did not know who had made this notation on the card, but that it was his opinion that the dispatcher had done it.

Appellant contends that the words "murder & amd robbery" are hearsay, and that the trial court erred in permitting the card to be introduced without first eradicating this notation. The State argues that the notation was made in the police department's general course of business and was properly admitted as a business record. V.A.C.S. Art. 3737e. Solice testified that these cards had been prepared in the general course of business of the Corpus Christi Police Department.

Assuming without deciding that the notation is inadmissible, we hold that the introduction of the card with the notation intact was harmless error. There is certainly no dispute that this is a case of murder committed in the course of an armed robbery. Appellant's name does not appear on the card, nor does the card in any way connect appellant to the offense. The record is devoid of any showing of harm to appellant due to the introduction of the computer card. See and compare *Battee v. State*, 543 S.W.2d 91 (Tex.Cr.App.1976); *Coulter v. State*, 494 S.W.2d 876 (Tex.Cr.App.1973).

Dr. Joseph C. Rupp, the Nueces County Medical Examiner, examined the bodies of the victims at the Maverick Market and conducted the subsequent autopsies. He testified that Norma Guevara had been shot twice in the back at close range, and that the two bullets had been recovered from underneath the skin of her chest where they had been stopped by the floor. The second victim, Dora Garcia, had been shot three times in the back at close range; two of the bullets had been caught in her clothing, and the third was found beside the body.

Appellant contends that the trial court erroneously permitted Dr. Rupp to testify outside the range of his expertise. This contention is based on the following exchange:

"BY MR. MOBLEY [Prosecuting Attorney]:

"Q. Dr. Rupp, based on your experience and your observations of the scene out there that night and in viewing the two women, would you state if you have an opinion based on your medical and forensic background as to which of the victims was shot first?

"A. Yes; I do.

"MR. BRADSHAW [Defense Counsel]: I do not mean to have to interrupt, Your Honor, and I don't have any objection to that question as to whether you have an opinion; I do have an objection as to what it is.

"THE COURT: All right; and the answer was: Yes, he does have an opinion.

"MR. MOBLEY: What is your opinion as to which of the victims was shot first, based on your findings and your autopsies?

"MR. BRADSHAW: I object to that as calling for a conclusion which is not within the area of the Doctor's expertise and requires, essentially, he know who the assailant walked over to and shot first and requires a degree of speculation that is unwarranted and is unnecessary and is, again, outside the expertise of the Doctor.

"THE COURT: Counselor, I would have sustained your objection a moment ago, except, I think we have it clear now with the witness as to how he is to answer the question and based upon the manner in which I think he is going to answer the question, I will overrule the objection.

"Go ahead, please.

"THE WITNESS: Of the two women, Norma Guevera and Dora Garcia, the younger, definitely, was shot first.

"Q. (By Mr. Mobley): Based on your observations and medical opinion and your observations at the scene and your autopsy of Norma Guevera, Dr. Rupp, do you have an opinion as to why you feel she was shot, first?

"MR. BRADSHAW: Your Honor, I am going to object to that because it calls for the Doctor to speculate on the movement of an assailant and calls for a conclusion which is non-medical in the sense that it has nothing to do with the autopsy findings concerning the physical body of the deceased person.

"THE COURT: Objection overruled.

"Q. (By Mr. Mobley): You may answer, Doctor.

"A. There are numerous reasons, however, that are pertinent. One is that the subject that was shot, second, if it was not the older woman, the younger woman was not in the proper position, when she was shot as the evidence shows that the bullet that was found beside her body, and I might add, also, because of the peculiar position of her legs, the older woman's legs, that it was the older woman who was shot second.

"Q. Would the fact that Dora Garcia was not in a proper position, be the reason for the bullet passing completely, through her body?

"A. Yes, sir; that is correct. She was not completely in a prone position, that is against the floor.

"Q. Then when the other two shots were fired in your opinion based on your original observations and past experiences as to what the position was of her body, when the final two shots were fired?

"A. That is against the floor."

Appellant concedes that an expert witness may express an opinion as to the relative positions of the parties at the time of a homicide. *Mays v. State,* 563 S.W.2d 260 (Tex.Cr.App.1978). He argues, however, that an expert witness may not express an opinion as to which of several bullets was fired first. He relies on *Bailey v. State,* 365 S.W.2d 170 (Tex.Cr.App.1963), which we overruled in *Mays* to the extent it was in conflict with that opinion, but which appellant asserts is still good law as to the contention he puts forward.

 In *Mays,* the medical testimony regarding the position of the victim when the shots were fired was crucial since the testimony conflicted with the defendant's version of the shooting. In *Bailey,* the testimony of the medical examiner that the victim had been shot first in the back conflicted with the defendant's claim that she had acted in self-defense. But in the instant case, the question of which victim was shot first is irrelevant to any issue in the case. Appellant did not testify, nor did he in any way raise an issue as to provocation, accident, or self-defense. Both victims were shot within the space of a few seconds. The undisputed medical testimony as to the location of the bullets in the bodies of the victims leads to the inescapable conclusion that the victims were lying face down on the floor when they were shot. The error, if any, in permitting Dr. Rupp to testify that Norma Guevara was shot before Dora Garcia was harmless beyond a reasonable doubt.

Appellant contends that venire member Jane H. Parker was improperly excluded from the jury for cause in violation of

*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He argues that she did not unambiguously indicate that she would vote against the death penalty in any case.

During voir dire examination by the prosecutor, Parker was asked:

> "How strongly do you feel about the death penalty, Ms. Parker?
>
> "A. I feel very strongly. I could never send anyone to death.
>
> "Q. In other words, you are strongly opposed to the death penalty?
>
> "A. I am strongly opposed to it; yes, I am."

The prosecutor then explained the procedure followed under Art. 37.071, V.A.C.C.P., and asked Parker if she could be fair to the State in answering the issues:

> "A. I am afraid I would not be very fair.
>
> "Q. You would not be very fair?
>
> "A. No; I would find it very difficult.
>
> "Q. I understand your position, ma'am. And do I correctly understand you, when I say, that you feel, no matter how bizarre or macabre a case may be or how vicious or how deliberate it may be, it still would be extremely difficult for you to answer the questions: 'yes', knowing those answers could result in the death penalty?
>
> "A. It would be very difficult for me to pass judgment on someone else's life and therefore it goes against God.
>
> \* \* \* \* \* \*
>
> "Q. You don't think you could do that?
>
> "A. No; I don't. You asked me to be honest. And I am telling you how I feel. I could never live with myself, again."

In subsequent questioning, Parker seemed to equivocate, leading the trial court to ask:

> "THE COURT: Ms. Parker, I have heard different answers here. And some, frankly, are inconsistent.
>
> "You, just now, you said, you could not vote to take another person's life, as a juror. .

"Is that correct?

"THE VENIREMAN: That is correct.

"THE COURT: Yet, a moment ago, Mr. Mobley gave you an example of the baby being chopped up and killed by a man with a machette and you said in a case like that, that might be a proper case to take someone's life.

"And I am having trouble in understanding you, ma'am.

"THE VENIREMAN: The answer: Really, I could not do it.

"THE COURT: Even in the baby example?

"THE VENIREMAN: I am afraid, I just don't think I could do such a thing.

"THE COURT: In other words, you could not imagine a case where you could vote the death penalty?

"THE VENIREMAN: You see, all you people, you people are pushing me so— and, yes; you could imagine such a case, but it would have to be some case.

"THE COURT: Ms. Parker, we have to push that, I guess, as it is necessary to know, exactly, how you feel on this point.

"Therefore, let me ask you one more time: Could you conceive of a case where you, yourself, could vote to assess the death penalty?

"THE VENIREMAN: Well, this is so ridiculous, because, of course, anybody could. But I don't really think, when I got down to it, I could do it.

"THE COURT: Let's see if this helps: Are you saying, you could conceive of a case where you think the death penalty ought to be imposed; but if it became your duty to do it, you could not do so?

"THE VENIREMAN: That is pretty good—that's not fair of you.

"THE COURT: Could you conceive of a case, if you read about it in the papers and read where a jury assessed the death penalty, you would say, they did the right thing?

"THE VENIREMAN: I would agree with that; yes, sir.

"THE COURT: But if you were sitting on the jury, yourself, you could not vote to assess the death penalty?

"THE VENIREMAN: That is right."

During his examination of Parker, defense counsel posed a hypothetical case in which a defendant went to an orphanage, poured gasoline over the children, and burned forty children to death. Asked if she could vote for the death penalty in such a case, Parker answered, "No; no, I still would have to say I don't think I could do it."

This Court has previously noted the problem posed by the "equivocating venireman," and we have held that *Witherspoon* does not require certain formal answers. *White v. State*, 543 S.W.2d 104 (Tex.Cr.App. 1976). Parker's answers reflect her strong feelings against the death penalty, and at the very least cast serious doubt on her ability to serve as a fair and impartial juror. *Tezeno v. State*, 484 S.W.2d 374 (Tex. Cr.App.1972). We hold that the trial court did not err in excluding Parker from the jury. See and compare *White v. State,* supra; *Moore v. State,* 542 S.W.2d 664 (Tex. Cr.App.1976); *Tezeno v. State,* supra.

Appellant also contends that venire member Mildred Lewis was erroneously excluded from the jury for cause. Lewis was excluded on the basis of bodily disease rendering her unfit for jury service. Art. 35.-16(a)(4), V.A.C.C.P.

Lewis interrupted her voir dire examination and stated:

"THE VENIREMAN: I—I don't feel good.

"THE COURT: Pardon, ma'am?

"THE VENIREMAN: I don't—I don't feel good. And I is physical, it's physical. I am sorry, and I told them, yeah, I told them I don't feel good, over there.

"And I told them I am on medication. And I wouldn't be able to take it. And I am feeling worse, now.

"THE COURT: Could you tell us what your physical condition is, ma'am?

"THE VENIREMAN: Yes, I have high blood pressure. I have nervousness. And I have hay fever and sinus and all messed up together."

Lewis went on to state that she was taking medication regularly for her high blood pressure and her nerves, and that she believed her physical condition would interfere with her duties as a juror. She expressed doubt as to her ability to sit through a long trial.

The trial court has the responsibility for determining the qualifications of a prospective juror when a challenge is made. Art. 35.21, V.A.C.C.P.; *McCary v. State,* 477 S.W.2d 624 (Tex.Cr.App.1972). We hold that the trial court did not abuse its discretion in granting the State's challenge to venire member Lewis. See *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr. App.1976).

Appellant complains of three instances of allegedly improper jury argument by the prosecutor during the punishment stage of the trial. The first statement complained of is the following:

"How many people have you ever, personally known in your entire lifetime, even one individual, that has been convicted of felonies four times, before they are 34 years of age and a one-man crime wave in Nueces County, Texas?"

Appellant's trial objection, which he brings forward on appeal, was that this statement is outside the record. The trial court overruled the objection.

Appellant's four felony convictions were introduced into evidence at the punishment stage. The reference to a "one-man crime wave" was a reasonable deduction from this evidence and, in the context of the punishment phase of the trial, a proper plea for law enforcement. See *Pogue v. State,* 474 S.W.2d 492 (Tex.Cr.App.1971).

While discussing the second punishment issue, the prosecutor argued:

"Now, you know, by past experience, that the best way to tell what a person is going to do in the future, whether he is an employee; or a child; or whether a friend is by judging what he has done in the past—

"THE COURT: Fifteen minutes, Mr. Mobley.

"MR. MOBLEY: —in deciding what he is going to do in the future.

"THE COURT: Fifteen minutes, Mr. Mobley.

"MR. MOBLEY: Thank you, Your Honor.

"In this hearing, character witnesses could have, also been presented by the State, who would testify simply to that.

"MR. BRADSHAW: Objection, Your Honor.

"THE COURT: I sustain the objection.

"You may not speculate on what character witnesses would testify to.

"MR. MOBLEY: May I say this, in that respect, the State of Texas could have brought in virtually every police officer in South Texas and—

"MR. BRADSHAW: I object to that statement, Your Honor, by counsel, and move the Court instruct the jury to disregard that statement. And I move for a mistrial.

"THE COURT: I sustain the objection, I grant your objection.

"And I deny your motion for mistrial."

Appellant contends that this argument injected extraneous facts into the case.

■ Appellant's general objection to the prosecutor's reference to character witnesses the State could have called was sustained, and the jury was instructed to disregard the statement. No other relief was sought. See *Rasberry v. State,* 535 S.W.2d 871 (Tex.Cr.App.1976); *Kennedy v. State,* 520 S.W.2d 776 (Tex.Cr.App.1975). Appellant's objection to the second remark, referring to "every police officer in South Texas," was also general. The prosecutor's statement was not completed, the objection was sustained, and the jury was instructed to disregard. The trial court did not err in denying appellant's motion for mistrial. *Rhynes v. State,* 479 S.W.2d 70 (Tex.Cr. App.1972); *Sanders v. State,* 453 S.W.2d 162 (Tex.Cr.App.1969).

Finally, also while discussing the second punishment issue, the prosecutor stated:

"Is he more likely than not, if he ever hits the streets, again, to commit violent crimes against other citizens? If that is the definition of probability, let's just look at the evidence in this case which without question shows that it is more than likely he will because of what he has done in the past.

"He has done it five times—he has done it five times. And what else he has done, we don't know about. And what else he has gotten by with, we will never know.

"MR. BRADSHAW: I object to that, that is a direct citation to the jury to consider things which are not in evidence. And I request the Court to instruct the jury to disregard that statement.

"THE COURT: The objection is sustained.

"Members of the jury, you are instructed to disregard that statement.

"MR. BRADSHAW: I move for a mistrial, Your Honor.

"THE COURT: Your motion for mistrial is denied."

■ Argument which invites the jury to speculate whether the defendant has committed other crimes not in evidence is improper, and the trial court properly sustained appellant's objection. In so doing, and by instructing the jury to disregard the statement, the trial court cured the error. *Morgan v. State,* 502 S.W.2d 695 (Tex.Cr. App.1973); *Sanders v. State,* supra. See also *Livingston v. State,* 531 S.W.2d 821 (Tex.Cr.App.1976); *Lamberson v. State,* 509 S.W.2d 328 (Tex.Cr.App.1974).

Appellant filed a pretrial motion in which he requested that the trial court

". . . order the prosecution to disclose all exculpatory evidence which the prosecution may have in its possession, and further that the prosecution reveal its entire file to the Court for review by the Court in camera for the Court's determination as to what evidence therein is exculpatory and, finally, that the Court order that a copy of that portion of the prosecution's file not deemed to be exculpatory be sealed for future review by the appellate court if necessary."

In his final ground of error, appellant "respectfully requests the Court of Criminal Appeals to review the sealed file and reverse this case if any evidence favorable to the accused was not turned over to him."

■ The motion in question was one of several pretrial discovery motions filed by appellant. The other motions, which requested specific information, were considered and ruled upon by the trial court, and appellant makes no complaint in this regard. During the trial, the State tendered witnesses' statements to appellant for the purpose of cross-examination. Although the prosecutor and the trial court agreed to appellant's request for an in camera inspection of the prosecutor's file, they were under no constitutional obligation to do so. There is no constitutional requirement that the prosecutor deliver his entire file to defense counsel for examination, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Bell v. State,* 442 S.W.2d 716 (Tex.Cr.App.1969), nor is there any constitutional requirement that the trial court peruse the prosecutor's file for exculpatory evidence in the absence of a specific request supported by some showing that such evidence exists. *Ransonette v. State,* 550 S.W.2d 36 (Tex.Cr.App.1976); *Campos v. State,* 468 S.W.2d 81 (Tex.Cr. App.1971).

■ In the instant case, appellant requested that the prosecutor produce "all exculpatory evidence which the prosecution may have." Such a general request is the equivalent of no request at all. *United States v. Agurs,* supra. On appeal in such a case, constitutional error is presented only if there is a showing that undisclosed evidence exists which creates a reasonable doubt that did not otherwise exist. *United States v. Agurs,* supra. Appellant has made no such showing. Indeed, appellant's ground of error is nothing more than a request for this Court to search through the prosecutor's file, with absolutely no showing that such a search would yield constitutional error. We refuse to engage in such a search.

Moreover, the prosecutor's file is not contained in the record on appeal. Appellant's written designation of material to be included in the record does not specify that the file be included, nor is there any other indication that appellant sought to remind the prosecutor or the trial court of the pretrial agreement. Appellant made no objections to the record. Thus, appellant waived any possible error by failing to secure the inclusion of the prosecutor's file in the record.

■ During the punishment phase of the trial, the State introduced evidence that appellant had been convicted of felony offenses on four previous occasions: twice for burglary, and once each for possession of marihuana and assault with intent to commit robbery. Appellant was incarcerated in the Department of Corrections for each of these offenses. This evidence, when considered with the evidence adduced at the guilt phase of the trial, is sufficient to support the jury's determination that appellant's conduct was deliberate and that appellant would commit criminal acts of violence that would constitute a continuing threat to society. See *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978); *Felder v. State,* 564 S.W.2d 776 (Tex.Cr.App.1978); *Brock v. State,* 556 S.W.2d 309 (Tex.Cr.App. 1977); cf. *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978).

The record discloses that appellant's trial was fair, that he was represented by experienced, appointed counsel, and that he was afforded all of his constitutional rights. Given the brutality of the crime for which appellant was convicted, and the circumstances of its commission, we cannot say that the severe penalty which was assessed is inappropriate.

The judgment is affirmed.