# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00418-CR

**Robert Wincott, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
### NO. 00-135-K368, HONORABLE BURT CARNES, JUDGE PRESIDING

Robert Wincott was indicted on three counts of engaging in organized criminal activity based on three alleged acts of aggravated robbery. *See* Tex. Pen. Code Ann. § 71.02 (West Supp. 2001). Wincott pleaded not guilty to all charges. The jury found Wincott guilty on two counts of aggravated robbery and one count of organized criminal activity, and assessed punishment at three concurrent prison terms of ninety-nine years each. Both parties agree that Wincott's conviction turned on accomplice testimony. Wincott challenges the admission of testimony of a police officer who allegedly testified as a "Truth Expert" in support of the accomplice. With or without the officer's testimony, Wincott argues that the evidence was legally insufficient to satisfy article 38.14 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979). Because we hold that the accomplice testimony was insufficiently corroborated, we reverse and render judgment of acquittal.

**FACTS**

From March to December of 1998, five similar robberies were committed near the Anderson Mill area of Williamson County. Each robbery targeted a take-out pizza restaurant; each involved a lone gunman wearing a ski mask and clothes that concealed his skin color. The police did not have a suspect until Saccone's Pizza was robbed on December 1, 1998. In this incident, a customer whose wallet was taken chased after the gunman's getaway vehicle. The gunman shot the customer. Following this shooting, the Austin Police Department received a Crime Stopper's tip that Brad Jones was attempting to escape town via bus. Jones was apprehended at the bus station.

On December 2, Jones admitted to the Saccone's robbery but initially denied involvement in the other crimes. Over the course of this first interrogation and a subsequent interview on December 4, Jones's version of events changed. He accepted partial responsibility for all five of the pizza store robberies, and he implicated Wincott, Aaron Johnson, Shad Williams, and Gary Olivier. Jones then entered into a plea bargain with the State. According to this arrangement, Jones pleaded guilty to three counts of aggravated robbery. He was sentenced to life imprisonment on the first count, but the court agreed to defer assessment of punishment on the remaining crimes until after Wincott's trial. The State agreed to recommend that Jones's sentences be served concurrently if Jones testified truthfully against his codefendants at trial.

Jones was the State's lead witness at Wincott's trial. According to Jones, Wincott participated in three robberies in 1998: Papa John's Pizza on March 29, Pizza Hut Pizza on April 26, and Dano's Pizza on May 9.[1] Jones testified that he and Wincott planned the robberies after watching

---

[1] Jones also implicated Wincott in two robberies of convenience stores, for which Wincott was not charged. According to Jones, Wincott was the gunman in the robbery of a Texaco gas

the movie "Pulp Fiction" numerous times. He said they first intended to rob a small convenience store by the house where Jones resided with his aunt. They found a ski mask belonging to the aunt, and borrowed a semi-automatic handgun with a laser sight from Johnson.[2] According to Jones, Wincott drove them to the convenience store, but their intended robbery was foiled when they encountered a police car parked outside.

## The Robberies

### Papa John's

Jones testified that on the way back to his residence he and Wincott passed a Papa John's pizza store, which they decided to rob. Wearing the ski mask and carrying the handgun, Jones robbed the store at gunpoint while Wincott stayed in the truck. When Jones came out, he did not see Wincott's truck; thinking that Wincott had panicked, Jones ran home. There he said he encountered Wincott and they split the stolen money.

The State presented the testimony of the three employees who were present that night at Papa John's. All three testified that a gunman with blond hair sticking out from underneath a blue ski mask entered the store shortly before they closed. The gunman demanded all of the money in the Papa John's safe; the lock had been inadvertently deactivated when an employee turned off the

---

station, while Jones waited in Wincott's truck. The other robbery allegedly involved Jones, Wincott, and Johnson, in which the three used Johnson's car and Jones robbed an AAMCO gas station with a gun.

[2] Jones testified that he borrowed the gun from Johnson but did not tell him that he planned to use it to commit a robbery; at some point, however, Johnson became interested in participating in the robberies and allegedly participated with Jones. An investigator with the Williamson County Sheriff's Department testified at trial that Johnson later admitted that he knew that his gun had been used in some of the robberies. Johnson did not testify at Wincott's trial.

3

electricity in the store. The robber pointed a gun with a laser sight directly at the forehead of Jason Steen, the manager in charge. The employees turned over all the cash and checks and were instructed to lie on the floor. None of the employees saw a getaway vehicle.

**Pizza Hut**

The second count of Wincott's indictment alleged that he had been the gunman in the robbery of a Pizza Hut. Jones testified that he and Wincott planned the robbery, trying to find a getaway route they could take on foot, because Wincott did not want to use his truck. Two employees testified that a lone gunman wearing a ski mask robbed the store around 10:00 or 10:30 p.m. Both Pizza Hut employees testified that the perpetrator used a partially silver gun. In addition, one estimated that the gunman was between 5'8" and 6'0" and "looked like he had been working out. He wasn't all skin and bones . . . so he had some build to him." The employee estimated the gunman weighed approximately one-hundred and eighty pounds.[3] Jones testified that Wincott was the gunman in this robbery and that after Wincott robbed the Pizza Hut, he ran back to Jones's residence.

**Dano's Pizza**

The third count of the indictment alleged that Wincott drove Jones to Dano's Pizza, where Jones committed an aggravated robbery. The State called Darren Smalley, a pizza maker at

---

[3] The State asserts that the description of the robber's height was closer to Wincott's than Jones's height. Jones testified that his height was between 5'10" and 5'11" and that he was five to six inches taller than Wincott. Strother testified that she did not know Wincott's height, but thought he was 5'8" or 5'9". Detective Mike Williams of the Austin Police Department testified that Jones was "probably close to 6 foot, 5'10", 5'11", somewhere in there, probably 160 pounds." He testified that Wincott was "5'8", 5'9" somewhere in there," and said that he thought he could possibly be as short as 5'5.5" or 5'6".

4

the time, and Daniel Paciocco, the owner of the establishment; both testified that shortly before closing, a man carrying a black and silver gun entered the restaurant demanding money. The gunman told Smalley to lie on the floor and remain there, and then instructed Paciocco to take the money out of the register. Paciocco removed the entire register till, but the gunman demanded that he place the money into a small plastic bag. The gunman then told both men to lie down. After remaining on the floor briefly, Paciocco told Smalley to call 911; Paciocco ran outside to see the perpetrator cross a privacy fence at the end of the parking lot. Paciocco testified that he heard a car door close but could not see the vehicle as it drove away.

Jones testified that he and Wincott decided that the Dano's robbery would be their last. He added that the robberies were no longer just a "game" because they were using the proceeds to pay off their debts to drug dealers.

Jones admitted that he later robbed two other establishments without Wincott using a different gun. One robbery involved Williams, who drove Jones to a Mr. Gatti's pizza store, where Jones used a stolen revolver. Finally, Jones confirmed that he robbed the Saccone's pizza store while using the stolen revolver; this time Olivier was his driver.

## DISCUSSION

### Expert Testimony

The State's final witness was Detective Michael H. Williams. Detective Williams of the Austin Police Department's robbery division was assigned to follow up on the Saccone's robbery. Williams provided general testimony regarding his interview of Jones after his arrest, and about how suspects like Jones never tell the truth at first, but if you chip away at them, you get "the complete

5

story out, the complete truth." The State asked Williams "whether Brad Jones was one of those people who started out being not completely truthful or not truthful at all." He said yes and then described how he got Jones to tell the truth: "I think as Brad became more familiar with myself and Detective Staha we started developing a rapport and basically that he needed to tell us the truth. He was an adult. He was responsible for what he did. And this truth eventually over some several hours started coming out."

Wincott complains that the trial court essentially permitted Williams to testify as a "Truth Expert" in violation of the rules of evidence, which do not permit an expert to give an opinion unless it would assist the trier of fact. An expert witness may not testify directly that a particular witness is truthful. *Yount v. State*, 872 S.W.2d 706, 712 (Tex. Crim. App. 1993). Permitting such testimony usurps the role of the jury in determining the credibility of witnesses, argues Wincott. By testifying about how an investigator "gets the truth out" of a suspect, the detective was permitted to bolster the testimony of the State's star witness, after Jones had been discredited, to Wincott's detriment.

On appeal, Wincott argues that Williams's testimony was improperly admitted in violation of rule 403, which excludes relevant information if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, and rule 702. *See* Tex. R. Evid. 403, 702. The State points out that this complaint has not been preserved because it was not the objection that was raised at trial in response to Williams's testimony. Rule 33.1 of the Rules of Appellate Procedure requires a specific timely objection at trial to preserve error. Tex. R. App. P. 33.1. When the State first asked Williams to describe what he does in an interview

6

with a suspect "to get them to be honest," Wincott objected that the testimony was not relevant. The court overruled the objection. The detective continued to testify about how he knows when a suspect is "trying to be truthful with you." Wincott raised a hearsay objection, which the court overruled. The detective continued:

> We get little bits of truth in the beginning. Sometimes we don't get any in the beginning, but sometimes we will get little bits of truth. That's where our job comes in as investigators to start chipping away and getting the complete story out, the complete truth.

Wincott raised a running hearsay objection when the State asked Williams if Jones was one of these people "who started out being not completely truthful or not truthful at all." Again the objection was overruled, and appellant was permitted to make a running hearsay objection to Williams's testimony of what Jones said during the interview and how he characterized the truthfulness of Jones's testimony. Although we share Wincott's concerns about the bolstering nature of the detective's testimony, we hold that the error raised on appeal was not properly preserved. We overrule this point of error, and turn to Wincott's complaint that Jones's testimony was not sufficiently corroborated.

## Corroboration of Accomplice Testimony

Wincott argues that the State failed to meet its burden under article 38.14 of the Texas Code of Criminal Procedure, which mandates corroboration of accomplice testimony.[4] *See* Tex.

---

[4] Because Jones was indicted for the same offense as Wincott, Jones is an accomplice as a matter of law. *See Villarreal v. State*, 576 S.W.2d 51, 56 (Tex. Crim. App. 1978) (stating that "[a]n accomplice witness is someone who has participated with another before, during, or after the

Code Crim. Proc. Ann. art. 38.14; *Nolley v. State*, 5 S.W.3d 850, 852-53 (Tex. App.—Houston [14th Dist.] 1999, no pet.). We consider this assertion as a challenge to the legal sufficiency of the evidence to sustain the conviction. *Nolley*, 5 S.W.3d at 852. The rule governing the use of accomplice testimony states: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14. Wincott argues that Jones's testimony was not sufficiently corroborated by evidence tending to connect Wincott with the robberies.

The State argues that Wincott supplied the evidence that tended to connect him to the robberies through his own admissions, particularly the ones he made to his girlfriend at the time of his arrest. It also contends that Wincott linked himself to the gun which, according to Jones's testimony, Jones and Wincott used in the three robberies. Finally, while it acknowledges that the independent evidence alone may not have been sufficient to convict Wincott of the robberies, the State maintains that it was sufficient to corroborate Jones's testimony.

We begin by voicing the strong policy concerns that weigh against reliance on accomplice testimony.[5] The rule reflects a legislative determination that accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person. *Nolley*, 5

---

commission of a crime. . . . [o]ne is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged") (citations omitted); *Nolley v. State*, 5 S.W.3d 850, 853 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

[5] The rule for corroboration of accomplice testimony has remained unchanged since the first Texas Code of Criminal Procedure. *Walker v. State*, 615 S.W.2d 728, 731 (Tex. Crim. App. 1981).

S.W.3d at 852-53 (citing *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)). The accomplice's motives in testifying against the accused may well include malice or an attempt to curry favor from the state in the form of a lesser punishment, or perhaps, no punishment. *Id*. The Texas legislature has determined that because the testimony of an accomplice is inherently untrustworthy and should be viewed with caution, uncorroborated testimony of an accomplice, standing alone, is not enough to support a criminal conviction. *Id*.

The court of criminal appeals has described an accomplice as a *discredited witness*. *Walker v. State*, 615 S.W.2d 728, 731 (Tex. Crim. App. 1981). No matter how complete a case may be established by an accomplice witness, a conviction is not permitted unless the accomplice's testimony is corroborated. *Id*. The testimony of an accomplice witness is untrustworthy and should be received and acted on with caution. *Id*. It should be carefully scrutinized not only because of the potential self interest of the accomplice, but because such testimony is evidence from a corrupt source. *Id*.

These considerations, which form the basis for the requirement that accomplice testimony be sufficiently corroborated, also inform the skepticism with which courts view evidence that tends to connect the accused only with the *accomplice*, rather than with the charged offense. "The mere presence of the accused in the company of the accomplice . . . shortly before or after the time of the offense is not, in itself, sufficient corroboration of the testimony of the accomplice." *Nelson v. State*, 542 S.W.2d 175, 177 (Tex. Crim. App. 1976). Courts have rejected guilt by association as corroborating evidence because if "such testimony [placing the defendant and the accomplice together] be corroborative, then accomplices might be held corroborated in their claim

9

of the guilt of any person upon whom they might seek to fasten a crime, by mere proof that such parties had been seen together." *Weatherred v. State*, 272 S.W. 471, 472 (Tex. Crim. App. 1925). Association with the admitted criminal may be corroborative, however, if offered in conjunction with other facts and circumstances that sufficiently connect the accused with the commission of the crime. *Cherb v. State*, 472 S.W.2d 273, 280 (Tex. Crim. App. 1971). Examples of such corroborating circumstances include subsequent flight, possession of the fruits of the crime, and presence at or near the scene of the crime at an unreasonable hour. *Id.*; *Cawley v. State*, 310 S.W.2d 340, 342 (Tex. Crim. App. 1957).

In evaluating the sufficiency of the evidence to corroborate accomplice testimony, we consider each case on its own facts and circumstances, and look to all facts in seeking corroboration. *Nolley*, 5 S.W.3d at 853. The corroborative evidence may be circumstantial or direct. *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). On appeal, we determine whether the jury heard proof of material facts tending to connect the accused with the commission of the offense. *Edwards v. State*, 427 S.W.2d 629, 632-33 (Tex. Crim. App. 1968). We first eliminate from consideration the evidence of the accomplice witness. *Id*. at 632. We then examine the other inculpatory evidence to ascertain whether it tends to connect the defendant with the offense. *Id.*; *see also Burks v. State*, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994). While it is true that the non-accomplice evidence may be circumstantial rather than direct, it still must tend to connect the accused to the offense. *See Burks*, 876 S.W.2d at 888. If the State fails to produce any non-accomplice evidence tending to connect the defendant to the offense, then the defendant is entitled to an acquittal. *See* Tex. Code Crim. Proc. Ann. art. 38.14; *Taylor v. State*, 10 S.W.3d 673, 685 (Tex. Crim. App. 2000). Setting aside Jones's

10

testimony, we will examine the non-accomplice inculpatory evidence, which the State urges tends to connect Wincott to the commission of the three robberies.

The State proffers twelve fact scenarios, which it argues tend to connect Wincott to the robberies. The State maintains that this evidence provides compelling evidence, direct and circumstantial, of Wincott's guilt. The State essentially argues that Wincott related facts only a participant in the robberies would know, made certain admissions, and then made "transparent attempts to qualify those admissions" thereby expressing guilt for his participation. Finally, the State argues that these facts alone need not be sufficient to convict to corroborate accomplice testimony. The State relies on *Casias v. State*, 36 S.W.3d 897 (Tex. App.—Austin 2001, no pet.), to argue that the corroborating evidence in that case was "nowhere near specific enough to identify a particular offense or victim," yet this Court held the evidence was "sufficient to *tend to connect* appellant with the murder." *Id*. at 902. The State posits that the evidence as a whole shows Wincott's consciousness of guilt. *See Torres v. State*, 794 S.W.2d 596, 598-99 (Tex. App.—Austin 1990, no pet.).

**Facts Only a Participant Would Know**

The State first contends that Wincott revealed "significant facts regarding the robberies that likely could have been known by only a participant." In particular, the State claims that Wincott linked himself to the gun used in the three robberies. The State repeatedly emphasized this evidence at oral argument as it appears to be the State's strongest argument.

Morgan Strother was Wincott's girlfriend from May 1998 until his arrest. She testified that after Aaron Johnson was arrested, Wincott told her "that Aaron was—he had some gun,

I guess, and was supposed to get rid of it. And instead he went home before he got rid of it, and the cops were at his house." When asked if Wincott had told her how Johnson was supposed to get rid of the gun, Strother responded that "[h]e was supposed to throw it maybe off—it was either the dam or a bridge. I don't remember." According to Strother, Wincott grew concerned about being arrested only after Johnson was arrested.[6] Strother testified that Wincott told her "[t]hat Aaron was the type of person that would pretty much give up anybody to save himself," and that Wincott was concerned that Johnson would implicate him in something. The State argues that the timing of Wincott's concern about being arrested provided the link between the gun that was used in the robberies and Wincott's participation in those robberies.

In addition to the evidence emphasized by the State, the record also reveals that Wincott generally kept company with Jones and the other suspects. Strother testified that although Wincott did not seem worried after Jones was arrested, Wincott "was trying to make sure [he] didn't come into contact really with Shad or Gary or, you know, trying to stay away from the other people who were involved." She stated that Wincott specifically became worried about the robberies after Johnson was arrested, but she also explained that after both Jones and Johnson were arrested, Wincott "was concerned that he'd be arrested." The prosecution asked her how she knew that. Strother answered, "Because everybody else, you know, the whole group of people that predominantly hung out together, had already been arrested."[7] When put into context, Strother's

---

[6] Jones was arrested first, then Johnson.

[7] The State also relied on Strother's testimony that she knew Wincott drove a black Ford truck, the same truck that, according to Jones, he and Wincott used during the three robberies. Only Jones, however, connects Wincott's truck to the crimes. In analyzing whether evidence is corroborating, we must not consider the accomplice's testimony. *Edwards v. State*, 427 S.W.2d 629,

testimony tends to connect Wincott to Jones, Johnson, and the other suspects. Evidence that raises guilt by association, however, is insufficient to tend to connect Wincott to the robberies. *See Weatherred*, 272 S.W. at 472.

The State urges that in a letter to Jones, Wincott admitted a fact only a participant would know: "As far as Tiffany goes, I don't know what you told her. The fact that she wasn't at any of the crimes makes a big difference."[8] Jones testified, however, that Johnson and Williams knew details about the first three robberies even though they were not involved. The reasonable conclusion is that all these individuals who "predominantly hung out together" knew about the robberies, whether or not they were participants. Such evidence may raise a suspicion that some combination of these individuals participated in any of the five robberies, but even a strong suspicion is insufficient to corroborate the testimony of the accomplice witness. *See Umsted v. State*, 435 S.W.2d 156, 158 (Tex. Crim. App. 1968) ("The testimony . . . raises a strong suspicion or probability of . . . guilt, but such does not constitute proof of . . . guilt. The evidence is not sufficient to corroborate the testimony of the accomplice witness. This being true, the mandatory provisions of Art. 38.14 . . . prohibit this court from permitting the conviction to stand."); *Thomas v. State*, 313 S.W.2d 311, 313 (Tex. Crim. App. 1958). Thus, the evidence does not reveal facts that only a *participant* would know

---

632 (Tex. Crim. App. 1968). In setting aside Jones's testimony, we conclude that Strother's testimony does not tend to connect the truck to the robberies. Further, no robbery victim saw a getaway vehicle. "The accomplice may state any number of facts, and these facts may all be corroborated by the evidence of other witnesses; still, if the facts . . . do not tend to connect the defendant with the crime . . . this would not be such corroboration as is required by the code." *Umsted v. State*, 435 S.W.2d 156, 157 (Tex. Crim. App. 1968). Jones's claim that Wincott's truck was used in the robberies was not corroborated.

[8] Tiffany McMillan was Jones's girlfriend at the time of his arrest.

13

and fails to corroborate Jones's testimony. We have no more than a suspicion that culminates from the association of these individuals. We reject the effort to equate guilt by association with corroboration. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178 (1951) (Douglas, J., concurring) ("guilt by association [is] one of the most odious institutions of history. . . . Guilt under our system of government is personal.").

## Admissions by Wincott

The State relies heavily on Wincott's communications, primarily letters, with Strother and another woman, Amber Ramirez, to assert that Wincott made admissions that tend to connect him to the robberies. The State specifically refers to Wincott's statement to Strother while discussing the robberies that he had done some "bad things" and his expression of relief over being arrested. The State also points to Wincott's letters to Strother expressing sorrow for the bad things he had done.[9] The State urges that the "bad things" referred specifically to these three robberies and not to other misdeeds such as his drug use.[10] The State also notes a letter Wincott wrote to Ramirez saying that they should not talk about his arrest because he was ashamed of it. The State then accuses Wincott of attempting to qualify his admissions. The State asserts that only after his arrest did Wincott try to influence Strother into believing that his reference to "bad things" referred to his drug use.

---

[9] He also stated in one letter that he hoped Jones would commit suicide.

[10] Wincott wrote in a letter to Strother that he did not get in trouble every time he was wasted, but that every time he did get in trouble he had been wasted.

14

Moreover, the State points to letters Wincott wrote to Jones while both were imprisoned in the same facility, saying they portray Wincott's attempt to manufacture testimony for his benefit. The State argues the letters reflect guilt. For example, Wincott gave Jones advice about how to deal with witnesses and to prepare for his own trial,[11] but then told Jones not to disclose that Wincott was advising him. The State asserts that this proves that Wincott knew that if Jones revealed this communication, it would incriminate Wincott in the robberies. Such an inference is only one of many that could be drawn from Wincott's request that Jones not publicize Wincott's advice. Wincott also urged Jones to sabotage the State's case by not testifying against Wincott. The State urges that Wincott's communications imply that Jones had information that could convict Wincott of the robberies. But they just as forcefully infer that Wincott thought Jones was falsely accusing Wincott in order to curry favor with the State in Jones's own prosecution.

Although the State tries to equate Wincott's admitted "bad things" to the robberies, the testimony at trial is inconclusive at best.

> [Strother]: [Wincott] made a statement that he had done some bad things in the past and that he and Brad had done some bad things in the past, but that was –
>
> . . . .
>
> [State]: Did he specify at that point what he was talking about?
>
> [Strother]: No.

---

[11] In one instance, Wincott wrote a letter, which he had another inmate handcopy, that urged Jones to write and sign a letter saying that Jones had lied in implicating Wincott. The letter also encouraged Jones to notify his attorney about Johnson's involvement with the handgun.

> . . . .
>
> [State]: In December, before he was arrested when he was talking about worrying about being arrested for the bad things that he and Brad had done, was he putting that in the context of having done drugs together? Or was it in the context of the robberies and everybody being arrested?
>
> [Strother]: He didn't say it in any context really. I mean we were talking about several things, and we were talking about the robberies. . . .

Strother was pregnant with Wincott's child at the time he was arrested. They were discussing that pregnancy, among other things, when Wincott brought up the bad things he had done. Strother stated that in a later phone call Wincott told her he was referring to his drug use when he had expressed remorse for having done some bad things.

In their vague context—a conversation involving various subjects any of which could be construed as "bad things"—his statements do not tend to connect him to the crimes with which he was charged. At most, they raise a mere suspicion that he is referring to his participation in the robberies. As noted, even a strong suspicion is insufficient to satisfy article 38.14. *Umsted*, 435 S.W.2d at 158.

Likewise, the communications that the State characterizes as attempts to manufacture favorable testimony raise no more than a suspicion that Wincott participated in the robberies. His statements to Jones refer not only to the crimes with which Wincott was charged, but also to other robberies in which Wincott was not implicated. There was evidence in letters that Jones considered Wincott the only person capable of giving him wise counsel. Jones wrote to Wincott:

> When we were free, you were the only person on the planet that I respected. Believe it because it's true. The fact that I actually heard your wise words, no matter what

16

you think, I always at least thought about what you said. The fact that when you talked I did listen, to me, is a sign of how I looked up to you.

This relationship of trust may explain Wincott's attempt to guide Jones through his legal travails as much as motive to manipulate evidence. Such an explanation is supported by the fact that, as the State acknowledged, Wincott must have known that all of these communications would be intercepted and serve as potential evidence in his trial. Wincott's letters reflect his reasonable concern about the outcome of his own trial, but they do no more than link Wincott to Jones. They do not link him to the particular crimes with which he was charged. Evidence of guilt by association does not suffice as corroborating evidence. *See Weatherred*, 272 S.W. at 472.

## Consciousness of Guilt

The State contends, nonetheless, that Wincott's letters encouraging Jones not to testify are attempts to manipulate evidence that indicate a sense of guilt and as such, they present circumstances tending to prove he committed the crimes with which he is charged. Conduct on the part of a person accused of a crime subsequent to its commission may indicate a consciousness of guilt for that crime. *See Brown v. State*, 657 S.W.2d 117, 119 (Tex. Crim. App. 1983). Additionally, the State argues that in *Casias*, this Court found sufficient corroboration in evidence that, as here, did not specifically identify an offense or victim. *See Casias*, 36 S.W.3d at 902. The State maintains that the evidence as a whole sufficiently corroborates Jones's testimony.

The cases involving attempts to manipulate evidence cited by the State, however, are distinguishable. For example, the court of criminal appeals found that the defendant's possession of a gun and his threats to kill the victim's family constituted an effort to suppress and destroy evidence

17

against him. *Brown*, 657 S.W.2d at 119. Similarly, this Court held that the defendant's threats to his wife to take away her military benefits and her children's military identification cards if she testified reflected a consciousness of guilt, and was therefore admissible. *Torres*, 794 S.W.2d at 598. In yet another case, the defendant threatened the prosecution, "I'll get you if it's the last thing I'll do." *Johnson v. State*, 583 S.W.2d 399, 408-09 (Tex. Crim. App. 1979).

Wincott's protestations of innocence, even in the form of asking Jones to admit that he lied or to not testify altogether, are far different from the threats that indicate a consciousness of guilt. The evidence on which the State relies only persuades us that Wincott sought to bring out what he perceived to be the truth in the case. He did not threaten Jones, nor did he ask Jones to tell a different version of the events. Wincott's actions, asserting his innocence, do not amount to manipulation of evidence that indicates a consciousness of guilt and are not sufficiently corroborating.

**Evidence as a Whole**

Finally, the State urges that the evidence as a whole is similar to that in *Casias*, in which we found sufficient corroboration of the accomplice's testimony. *See Casias*, 36 S.W.3d at 902. The chief corroborating evidence in *Casias* included testimony from an inmate, Vernon Walker, incarcerated with Casias. Walker testified that Casias told him that he had ordered a hit on "some Blood or white dude," but that the gunman chickened out and accidentally shot another person. *Id*. This non-accomplice testimony alone tended to connect Casias to the murder. Walker's testimony was combined with other, ambiguous inculpatory evidence and together we found it sufficient to corroborate the accomplice. Here, there is no single piece of inculpatory evidence other than Jones's

testimony. That alone will not suffice. Because the State failed to produce non-accomplice testimony tending to connect Wincott to the three robberies, we sustain Wincott's first point of error.

## CONCLUSION

We hold that Wincott failed to preserve error regarding the bolstering nature of Detective Williams's testimony. Nonetheless, we hold that the State's evidence did not tend to connect Wincott to the crimes. Although the State introduced a substantial amount of evidence attempting to prove Wincott's participation in the robberies, the non-accomplice testimony merely connected Wincott to the accomplice and other suspects but not to the offenses themselves. Because suspicion alone does not satisfy the State's burden to corroborate Jones's testimony, we reverse the conviction and render judgment of acquittal.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Reversed and Rendered

Filed:   June 7, 2001

Publish

19